# United States Court of Appeals
## For the First Circuit

No. 04-1226

EDMUND F. BURKE,

Plaintiff, Appellant,

v.

TOWN OF WALPOLE; JOSEPH BETRO; RICHARD STILLMAN;
JAMES J. DOLAN; WILLIAM F. BAUSCH; LOWELL LEVINE;
STEPHEN MCDONALD; KEVIN SHEA; KATHLEEN CROWLEY,

Defendants, Appellees,

ROBERT MARTIN,

Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Selya, Lipez, and Howard, Circuit Judges.

Robert S. Sinsheimer, with whom Susan Sivacek and Sinsheimer
& Associates were on brief, for Appellant.
James W. Simpson, Jr., with whom Douglas I. Louison and
Merrick, Louison & Costello, LLP, were on brief, for Appellees Town
of Walpole, Joseph Betro, Richard Stillman, James J. Dolan, and
William F. Bausch.
Erin George, with whom Matthew H. McNamara and Thorn Gershon
Tymann and Bonanni, LLP, were on brief, for Appellee Lowell Levine.
Suzanne T. Caravaggio, with whom Joseph P. Kittredge and Law
Offices of Timothy M. Burke were on brief, for Appellees Stephen
McDonald and Kevin Shea.
Robert M. Mendillo, with whom Mendillo & Ross, LLP, was on
brief, for Appellee Kathleen Crowley.
Thomas F. Reilly, Attorney General, and Natalie S. Monroe,
Assistant Attorney General, on brief for Appellee Robert Martin.

April 26, 2005

**LIPEZ, <u>Circuit Judge</u>**.  This civil rights case requires us to decide whether police officers of the Town of Walpole and the Commonwealth of Massachusetts Department of State Police ("Massachusetts State Police" or "MSP") were entitled to summary judgment on Plaintiff-Appellant Edmund F. Burke's claim that they violated his Fourth Amendment rights when they arrested him for a brutal murder he did not commit.  We must also decide whether forensic dentists/odontologists who assisted in the murder investigation were entitled to summary judgment on Burke's claims that they fabricated or exaggerated inculpatory bite mark evidence in support of probable cause.  Finally, we must decide whether the Chief of Police of the Town of Walpole was entitled to summary judgment on Burke's claim that he defamed Burke after his arrest.

We first identify the defendants and their official positions.  Defendants James J. Dolan, William F. Bausch, Joseph Betro, and Richard Stillman were employed in the Police Department of Defendant Town of Walpole, Dolan and Bausch as detectives, Betro as Chief of Police, and Stillman as Lieutenant and press officer. Defendants Stephen McDonald and Kevin Shea were Troopers with the Massachusetts State Police assigned to the Crime Prevention and Control Unit at the Norfolk County Office of the District Attorney,[1] with Shea holding the rank of Sergeant.  Defendants Dr.

---

[1]The MSP operates a "Division of Investigative Service" at the District Attorney's Office.

Lowell Levine and Dr. Kathleen Crowley were employed as forensic odontologists, Dr. Levine as an independent consultant to the Norfolk County District Attorney's Office, and Dr. Crowley on a part-time basis with the Massachusetts Office of the Chief Medical Examiner. Appellee Robert Martin was employed as a chemist at the MSP Crime Laboratory.

After a careful review of the record, with our focus on Burke's principal § 1983 claim, we conclude the following:

- viewing the evidence as we must on summary judgment, Burke has proffered evidence sufficient to support a finding that he was arrested without probable cause, and hence in violation of his Fourth Amendment right;

- Trooper McDonald's defense of qualified immunity fails because the record contains evidence, sufficient to create a jury question, that he intentionally or recklessly withheld exculpatory DNA evidence from the magistrate who issued the warrant to arrest Burke, and a reasonable officer would know that such conduct violated a clearly established Fourth Amendment right;

- Det. Dolan had a reasonable basis for seeking an arrest warrant and is entitled to summary judgment on the ground of qualified immunity;

- Det. Bausch and Sgt. Shea reasonably relied on a facially valid arrest warrant and are entitled to summary judgment on the ground of qualified immunity;

- the record fails to support Burke's allegation that Dr. Levine or Dr. Crowley intentionally or recklessly fabricated or exaggerated inculpatory bite mark opinions, and they are entitled to summary judgment on the ground of qualified immunity;

-4-

- Chief Betro's public statements made in the exercise of his official duties are conditionally privileged, and he is entitled to summary judgment on Burke's defamation claim.[2]

---

[2]Burke raised many other claims on appeal, all without merit. We have disposed of those claims summarily for substantially the same reasons given by the magistrate judge and adopted by the district court. These claims include: civil conspiracy under 42 U.S.C. § 1983 (Dr. Levine, Trooper McDonald, Sgt. Shea, Dets. Dolan and Bausch, Lt. Stillman, Chief Betro, and Dr. Crowley (appeal from dismissal of claim)), supervisory liability under 42 U.S.C. § 1983 (Lt. Stillman and Chief Betro), municipal liability under 42 U.S.C. § 1983 (Town of Walpole), defamation (Lt. Stillman), and medical malpractice (Dr. Levine). See Burke v. Town of Walpole, No. 00-10376, 2003 U.S. Dist. LEXIS 24912 (D. Mass. Aug. 5, 2003) (adopting magistrate judge's report and recommendation on motion to dismiss); Burke v. Town of Walpole, Nos. 00-10376, 00-10384, 00-12541, 2004 U.S. Dist. LEXIS 3964 (D. Mass. Jan. 22, 2004) (adopting magistrate judge's reports and recommendations on summary judgment and granting summary judgment to Dr. Crowley without referring motion to magistrate judge).

Given Burke's lack of due diligence in identifying MSP Crime Lab Chemist Robert Martin as a potential defendant, we also affirm, on the ground of prejudicial delay, the district court's decision denying Burke's motion to amend his complaint. See Steir v. Girl Scouts of the USA, 383 F.3d 7, 12 (1st Cir. 2004) ("[P]rotracted delay, with its attendant burdens on the opponent and the court, is itself a sufficient reason for the court to withhold permission to amend.").

We treat as waived all claims not mentioned in Burke's omnibus objection to the magistrate judge's reports and recommendations on summary judgment, Keating v. Sec'y of Health and Human Servs., 848 F.2d 271, 275 (1st Cir. 1988) ("[O]nly those issues fairly raised by the objections to the magistrate's report are subject to review in the district court and those not preserved by such objection are precluded on appeal."), as well as those insufficiently developed on appeal, United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived."). These include: Burke's claim that his home was searched without probable cause; all supplemental state law claims against Dets. Dolan and Bausch, Trooper McDonald, and Dr. Crowley; and all claims against two defendants whom Burke originally named as appellees (MSP Trooper Scott Jennings and Dr. Crowley's supervisor at the Office of the Chief Medical Examiner, Dr. Richard Evans).

## I. BACKGROUND

We recount the facts in the light most favorable to Plaintiff-Appellant Burke. Diaz v. City of Fitchburg, 176 F.3d 560, 561 (1st Cir. 1999). On the morning of December 1, 1998, the partially clothed and mutilated body of 75-year-old Irene Kennedy was found in a wooded area of Bird Park in Walpole, Massachusetts. She had been savagely beaten, strangled, and stabbed multiple times. Her breasts were exposed, and the left breast bore a visible bite mark. Investigators from the Town of Walpole Police Department and the Massachusetts State Police were called to the scene after Kennedy's husband alerted a park caretaker to the body's presence.[3] According to police reports, Mr. Kennedy told investigators that he and his wife walked in the park almost daily, but that they took separate routes because an injury prevented him from walking as quickly as his wife. He stated that he had gone looking for his wife when she failed to meet him at their usual time in the parking lot that morning, and that he had discovered her body in an area of the park where he knew she sometimes stopped to urinate.

Upon learning of Mrs. Kennedy's murder, one of the Kennedys' daughters, Nancy Tower, told Det. Bausch that he should

---

[3]The Walpole officers were not directly involved in the collection or analysis of forensic evidence, which was handled primarily by MSP Crime Scene Services and the Office of the Chief Medical Examiner.

speak to Edmund Burke, who lived on the street adjoining the parking lot where her parents routinely parked, and whose brother was married to another of the Kennedys' daughters. According to Det. Bausch's report, Tower told him that Burke was "very odd." Trooper McDonald also reported that Tower told him "that Eddie Burke is abusive to his mother" and that Burke's mother had told Mrs. Kennedy so. Trooper McDonald's report continued, "Ms. Tower stated that as a result of these conversations she felt that her mother was leery of Burke. Ms. Tower stated that subject Burke is unemployed and hangs around his house all day and seems very strange."

Later that morning, when Det. Bausch and another Walpole police officer visited Burke's home, where he lived with his 88-year-old mother, no one responded to their knocks or shouts. When they returned to the house a short time later, Burke's mother and brother were outside the house. According to Det. Bausch's report, Burke's mother told him Burke had been asleep when she left the house earlier that morning, and she seemed reluctant to wake him, but eventually agreed to do so. When Burke came outside, Det. Bausch informed him and his brother of Mrs. Kennedy's death. Burke then agreed to go to the police station to talk to investigators and left with his brother while Det. Bausch remained outside Burke's house.

Meanwhile, investigators at the crime scene employed a K-9 tracking dog to follow any scents detected near the body. According to a report by the dog's handler, the dog was introduced to "a pile of leaves [removed] from between the victim's legs" and then proceeded through the woods and across a field towards the street on which Burke lived. From there, the handler recorded, "we went to the right before the K-9 circled back to the left heading west. [The] K-9 . . . traveled along the . . . sidewalk past [Burke's house] for about fifteen to twenty feet. The K-9 circled back and traveled to the front door of [Burke's house] . . . ."

Det. Bausch saw the K-9 dog come out of the woods and ultimately stop at Burke's house. Det. Bausch then went to the police station, where he, Sgt. Shea, and Trooper McDonald questioned Burke. According to Sgt. Shea's report, Burke told the officers that he knew the Kennedys but not well, and he described their walking routine, which he knew because he usually saw them in the morning in the parking lot next to his house. Burke stated that he had been asleep at home at the time of the murder until the police arrived and his mother woke him up. Burke also stated that he had not visited the park for two years, intending the statement to mean that he had not gone to the park as a destination during that time. When Det. Bausch told Burke that a K-9 dog had apparently tracked a scent through the park to Burke's front door, Burke stated that he had taken a shortcut through the park late on

the Sunday night before the Tuesday morning murder, along with two of his cats. The officers considered this statement to be inconsistent with Burke's earlier statement that he had not visited the park for two years. While at the station, Burke provided a saliva sample for DNA testing and comparison with any foreign DNA collected from the body. He also permitted police to take his jacket in order to test it for forensic evidence.

In the days after the murder, Det. Dolan interviewed potential witnesses who lived in the vicinity of Bird Park or who walked regularly in the park. He recorded statements by several people who reported seeing a person matching Burke's description in the general area of the park in which the body was found in the days before the murder and also in the driveway outside Burke's house on the morning of the murder when Burke said he had been asleep.

Further examination of the victim's body by the Chief Medical Examiner's Office revealed a second bite mark on the other breast. Both bite marks were determined to have been made by a human. The bite marks were photographed and the bite mark on the left breast swabbed to collect DNA evidence from any traces of foreign saliva or skin. The swab from the victim's left breast and the sample of Burke's saliva were sent to the Maine State Police Crime Laboratory on December 4 for expedited DNA analysis because no such facility was yet in operation in Massachusetts. Two

swatches from Burke's jacket were also sent to the Maine Crime Lab on December 8.

On December 3, Burke agreed to go to the police station so that Dr. Crowley, a forensic odontologist with the Office of the Chief Medical Examiner, could make a mold of his teeth for comparison with photographs of the bite marks on the victim's breasts. Upon Dr. Crowley's recommendation, the district attorney's office hired Dr. Lowell Levine, an experienced forensic odontologist based in Albany, New York, to examine the mold of Burke's teeth and compare it with the photographs of the bite marks. On December 6, Dr. Crowley, Det. Dolan, and Trooper Jennings traveled to Albany to bring the mold and the photographs to Dr. Levine for examination. Dr. Levine formed an initial opinion that Burke could not be excluded as the source of the bite marks, but stated that he would need to see enhanced photographs in order to render a final opinion.

On December 9, Dr. Levine traveled to Boston to examine samples of the victim's clothing for bite marks and to instruct a photo laboratory employee on how to enlarge the photographs for better comparison with the mold of Burke's teeth. Dr. Levine then returned to Albany. Trooper McDonald and Sgt. Shea delivered the enlarged photographs to Dr. Levine in Albany late that same evening. Also on December 9, Theresa Calicchio, the forensic DNA chemist at the Maine Crime Lab who was assigned to perform the DNA

analysis of Burke's saliva samples, the swatches from his jacket, and the samples taken from the victim's left breast, called Trooper McDonald to inform him that she had extracted DNA from the samples she had received and that she would call with results of the analysis the next day.

Sometime on the morning of December 10, after comparing the mold of Burke's teeth with the enlarged photographs of the bite marks, Dr. Levine told Trooper McDonald that Burke's teeth matched the bite mark on the victim's left breast to a "reasonable degree of scientific certainty." That same morning, at around 11:00 AM, Calicchio informed Trooper McDonald that the DNA analysis showed that Burke was excluded as the source of male DNA found in the bite mark on the victim's left breast.[4]

According to a report by Sgt. Shea, he and another MSP Trooper, Scott Jennings, received Dr. Levine's bite mark opinion from Trooper McDonald on December 10 "at approximately 1315 hours" (i.e., 1:15 PM). Sgt. Shea and Trooper Jennings then incorporated the bite mark opinion into an affidavit in support of a search

---

[4]Calicchio wrote in her call log that Trooper McDonald called her, and that she "gave him verbal results on the DNA profiles obtained from the evidence." Calicchio's written report of the DNA analysis, which she prepared on December 12, stated: "A mixture of male and female DNA profiles was obtained from the breast swabbings (Items #1A and 1B). The predominant DNA profile matches the DNA profile of Irene Kennedy. The minor component of the DNA profile does not match the DNA profile of Edmund Burke. A nine locus DNA profile was obtained from the cuttings of [Burke's] blue jacket (Items 3A and 3B) which matches the DNA profile of Edmund Burke." No other human DNA was found on Burke's jacket.

-11-

warrant. Based on the facts recited in the search warrant affidavit, Det. Dolan prepared an application for a warrant for Burke's arrest.

At approximately 3:00 PM that afternoon, Burke was arrested at his home and brought to the police station in handcuffs. Det. Bausch, Sgt. Shea, Trooper Jennings, and Trooper McDonald, among other officers, were present during the arrest, although Troopers Jennings and McDonald testified at deposition that they were present only to conduct a search of Burke's home pursuant to the search warrant.

During Burke's arraignment the next day, December 11, Trooper McDonald called Sgt. Shea, who was at the courthouse, to tell him that the DNA analysis results excluded Burke as the source of the unidentified male DNA on the victim's left breast. Sgt. Shea alerted Assistant District Attorney ("ADA") Gerald Pudolsky mid-argument and pulled him away from the arraignment to tell him the new information. When Burke's arraignment resumed, ADA Pudolsky represented to the arraigning judge that DNA analysis had shown ambiguous results and that "further testing" was required.[5] He then sought Burke's detention without bail. Burke's attorney did not request Burke's immediate release on bail, and the arraigning judge ordered Burke held pending a bail hearing on

---

[5]It is unclear why ADA Pudolsky believed that the DNA analysis results were ambiguous and that additional testing was required to exclude Burke as the source of the male DNA in the bite mark.

December 29.  On that date, Burke was granted release on bail to house arrest with electronic monitoring.  His release was delayed, however, because his house could not immediately be equipped for monitoring.

On January 17, while Burke was awaiting release on conditional bail, a comparison of a palm print found on the victim's body against a set of palm prints taken from Burke by court order a few days earlier revealed that Burke was not the source of the palm print on the victim's body.  On January 19, the district attorney filed a nolle prosequi in the case on the ground that Burke's prosecution was premature.  The next day, forty-one days after his arrest, Burke was released from custody.[6]

Just over one year after his arrest, on December 13, 1999, Burke filed a civil rights action in state court against the Town of Walpole, Dr. Levine, and various officers and supervisors of the Walpole Police Department in their individual and official capacities alleging, among other state and federal law claims, that the defendants had violated 42 U.S.C. § 1983 by depriving him of his right under the Fourth and Fourteenth Amendments to be free

---

[6]According to a Boston Globe article of June 28, 2003, which Burke submitted in his opposition to the Walpole defendants' motion for summary judgment, police sought an arrest warrant for another man who was already serving a life sentence for murder after a DNA database search indicated a possible match between his DNA profile and samples taken from Kennedy's body.  We note that on June 24, 2004, the Associated Press reported that a Norfolk County grand jury had charged the new suspect with Kennedy's murder.

from arrest without probable cause.  Burke also alleged that Chief Betro had defamed him by falsely attributing the murder to him in public.  The defendants removed the case to federal court.  On December 14, 2000, Burke filed a similar action in federal court against various MSP Troopers, employees of the Massachusetts Chief Medical Examiner's Office, and the Commonwealth of Massachusetts.  Burke then filed an amended complaint to consolidate the two cases.  In May 2001 Burke amended his complaint to add claims of negligence against the Commonwealth.  Burke was permitted to amend his complaint again on February 19, 2002 to join Dr. Crowley as a defendant.  On July 16, 2002, Burke moved to amend his complaint a fourth time to join Robert Martin, a chemist at the Massachusetts Crime Lab, as a defendant, but the motion was denied.

In May 2003, all defendants except Dr. Crowley moved for summary judgment.[7]  In October 2003 a magistrate judge recommended granting summary judgment to all defendants on all claims in three comprehensive reports and recommendations.  See Burke v. Town of Walpole, Nos. 00-10376, 00-10384, 00-12541, 2003 U.S. Dist. LEXIS 24896 (D. Mass. Oct. 6, 2003) (MSP defendants); Burke v. Town of Walpole, Nos. 00-10376, 00-10384, 00-12541, 2003 U.S. Dist. LEXIS 24895 (D. Mass. Oct. 8, 2003) (Dr. Levine); Burke v. Town of Walpole, Nos. 00-10376, 00-10384, 00-12541, 2003 U.S. Dist. LEXIS

---

[7]Two other MSP defendants were dismissed from the suit prior to summary judgment.

24897 (D. Mass. Oct. 8, 2003) (Walpole defendants).  Dr. Crowley moved for summary judgment in December 2003.  On January 22, 2004, the district court adopted the magistrate judge's reports and recommendations and granted Dr. Crowley's motion for summary judgment without referring the motion to the magistrate judge. Burke v. Town of Walpole, Nos. 00-10376, 00-10384, 00-12541, 2004 U.S. Dist. LEXIS 3964 (D. Mass. Jan. 22, 2004).  Burke now appeals.[8]

## II. STANDARD OF REVIEW

We review a district court's grant of summary judgment de novo.  Valente v. Wallace, 332 F.3d 30, 32 (1st Cir. 2003). Viewing the record "in the light most hospitable to the party opposing summary judgment [and] indulging all reasonable inferences in that party's favor," Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990), we must discern whether "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c).  "In this

---

[8]Burke does not appeal the grant of summary judgment to one other Walpole defendant and two other MSP defendants, Burke, 2004 U.S. Dist. LEXIS 3964, or the grants of motions to dismiss filed by the Commonwealth of Massachusetts, Burke v. Town of Walpole, Nos. 00-10376, 00-10384, 00-12541, 2004 U.S. Dist. LEXIS 4033 (D. Mass. Jan. 22, 2004) (adopting magistrate judge's report and recommendation), and another employee of the Office of the Medical Examiner, Burke, 2003 U.S. Dist. LEXIS 24912 (adopting magistrate judge's report and recommendation).

context, 'genuine' means that the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party; 'material' means that the fact is one 'that might affect the outcome of the suit under the governing law.'" United States v. One Parcel of Real Prop., 960 F.2d 200, 204 (1st Cir. 1992) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986) (citation omitted)).

Where the moving parties -- here, the defendants -- do not have the burden of persuasion at trial and have "suggested that competent evidence to prove the case is lacking, the burden devolves upon the nonmovant-plaintiff to 'document some factual disagreement sufficient to deflect brevis disposition.'" Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794 (1st Cir. 1992) (quoting Mesnick v. Gen. Elec. Co., 950 F.2d 816, 822 (1st Cir. 1991)). A non-moving party may not successfully defend against summary judgment where the evidence relied upon "is merely colorable or is not significantly probative." Anderson, 477 U.S. at 249-50 (citation omitted). We thus ignore any "conclusory allegations, improbable inferences, and unsupported speculation." Roche v. John Hancock Mutual Life Ins. Co., 81 F.3d 249 (1st Cir. 1996) (citation omitted).

### III. CLAIMS AGAINST THE POLICE DEFENDANTS[9]

To establish a governmental official's personal liability under 42 U.S.C. § 1983, "it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right." Kentucky v. Graham, 473 U.S. 159, 166 (1985).[10] Burke alleges that the police defendants violated his Fourth Amendment right to be free from unreasonable seizure[11] by procuring: (1) his home arrest without a valid warrant, (2) his arrest without probable cause, and (3) his arrest on the basis of a misleading warrant application submitted with intentional or reckless disregard for the truth.

The defendants all insist that Burke suffered no constitutional deprivation. The individual police defendants

---

[9]Because we summarily affirm the grant of summary judgment to Lt. Stillman and Chief Betro on Burke's § 1983 claims, see supra note 2, we exclude them from the discussion that follows.

[10]42 U.S.C. § 1983 states, in relevant part: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ."

[11]The Fourth Amendment provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

further argue that even if the record supports Burke's allegations that he suffered a violation of a Fourth Amendment right, they are entitled to qualified immunity against suit for damages in their individual capacities for any acts or omissions that caused such a deprivation.  The doctrine of qualified immunity aims to

> balance [the] desire to compensate those whose rights are infringed by state actors with an equally compelling desire to shield public servants from undue interference with the performance of their duties and from threats of liability which, though unfounded, may nevertheless be unbearably disruptive.

Buenrostro v. Collazo, 973 F.2d 39, 42 (1st Cir. 1992).  Because exposure to civil rights suits may result in "distraction of officials from their governmental duties, inhibition of discretionary action, and deterrence of able people from public service," the doctrine of qualified immunity protects public officials from liability under § 1983 so long as "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 816, 818 (1982).  The doctrine thus protects "all but the plainly incompetent or those who knowingly violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).  Because "[q]ualified immunity serves not only as a defense to liability but also as 'an entitlement not to stand trial or face the other burdens of litigation,'" Cox v. Hainey, 391 F.3d 25, 29 (1st Cir. 2004) (quoting Mitchell v. Forsyth, 472 U.S. 511, 526

(1985)), "the applicability vel non of the qualified immunity doctrine should be determined at the earliest practicable stage in the case." Id.

The qualified immunity analysis consists of three inquiries: "(i) whether the plaintiff's allegations, if true, establish a constitutional violation; (ii) whether the constitutional right at issue was clearly established at the time of the putative violation; and (iii) whether a reasonable officer, situated similarly to the defendant, would have understood the challenged act or omission to contravene the discerned constitutional right." Limone v. Condon, 372 F.3d 39, 44 (1st Cir. 2004).[12] "Under ordinary circumstances, the development of the doctrine of qualified immunity is best served by approaching these inquiries" in sequence. Cox, 391 F.3d at 30. On summary judgment, then, the threshold question is whether "all the uncontested facts and any contested facts looked at in the plaintiff's favor" allege a constitutional violation. Riverdale Mills Corp. v. Pimpare, 392 F.3d 55, 62 (1st Cir. 2004).

---

[12]We have sometimes treated the qualified immunity analysis as a two-step test by combining the second and third prongs to ask whether "the contours of [the constitutional] right are 'clearly established' under then-existing law so that a reasonable officer would have known that his conduct was unlawful." Santana v. Calderon, 342 F.3d 18, 23 (1st Cir. 2003).

## A.      Deprivation of a Constitutional Right

### 1.      Issuance of a Valid Arrest Warrant

Burke maintains that the arresting officers never produced a warrant when they arrested him at his home on the afternoon of December 10 and that the copy of the warrant they have since produced is invalid because it is unsigned and unaccompanied by an affidavit or statement of facts in support of probable cause.

It has been "indelibly etched in jurisprudential granite," Buenrostro, 973 F.2d at 43, that a warrantless felony arrest in a private home is "presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980). See also Kirk v. Louisiana, 536 U.S. 635, 638 (2002) (per curiam) (existence of probable cause does not obviate warrant requirement absent exigent circumstances). Burke argues that a reasonable jury could infer that no valid warrant issued for his arrest. The police defendants insist that they have produced sufficient evidence to compel the inference that a valid arrest warrant was issued.[13]

_____

[13]The police defendants do not argue that exigent circumstances existed to arrest Burke without a warrant, or that Burke consented to the arresting officers' crossing "the firm line at the entrance to the house drawn by the Fourth Amendment." Payton, 445 U.S. at 590; see e.g., Robbins v. MacKenzie, 364 F.2d 45 (1st Cir. 1966) (describing actions sufficient to manifest consent to warrantless search of rooming house). The record is also silent on the question of whether Burke was free to withhold permission for the arresting officers to enter his house. See United States v. Beaudoin, 362 F.3d 60, 76 (1st Cir. 2004) (Lipez, J., dissenting) (Payton's heightened protections for private residences apply to defendant who opened the door "in response to a knock and request by law enforcement officials" even where defendant was in a motel

Under Massachusetts law, the police need not submit an affidavit in support of an application for an arrest warrant, Commonwealth v. Baldassini, 260 N.E.2d 150, 153-54 (Mass. 1970), and a mere "ministerial defect," such as the lack of an official signature, may not render an arrest warrant invalid, see Commonwealth v. Pellegrini, 539 N.E.2d 514, 515-16 (Mass. 1989) (excusing ministerial defects in search warrant where "there is no dispute that the judge intended to issue the warrant"). The Fourth Amendment to the U.S. Constitution requires at a minimum, however, that a warrant be "supported by Oath or affirmation." Additionally, Mass. Gen. Laws ch. 276, § 22 (1998) requires that an arrest warrant be issued "in compliance with the provisions of the Massachusetts Rules of Criminal Procedure," which in turn require an arrest warrant to be "signed by the official issuing it," Mass. R. Crim. P. 6(b)(1). Under the Commonwealth's paperless, computerized Warrant Management System,

> [u]nless there can be some evidence of a neutral consideration having been afforded an application for an arrest warrant, there can be no certainty that the warrant did not issue by circumvention of the statutory scheme. In theory, the police could issue their own warrants, and disseminate them via the [Warrant Management System].

---

room rather than a private home). Sgt. Shea testified at deposition that "we went into the side door of [Burke's] house and I called out his name and I said 'it's Kevin' and he came out and I told him that we had a warrant for his arrest." Sgt. Shea also testified at his deposition that he believed a valid arrest warrant had been issued.

Commonwealth v. Alves, No. 01-00156-001-005, 2001 Mass. Super. LEXIS 605, *13 (Mass. Super. Ct. Nov. 21, 2001).[14]

In lieu of a signed arrest warrant accompanied by an affidavit describing the facts allegedly establishing probable cause, the police defendants point to other evidence that a valid warrant was issued by a neutral magistrate upon a finding of probable cause prior to Burke's arrest. Det. Dolan testified at deposition that he prepared an application for an arrest warrant at the request of the District Attorney, including a summary of the facts establishing probable cause based on information provided by other investigating officers, and that he submitted the application to a magistrate. At his deposition, Det. Dolan identified as the text of his probable cause summary a six-paragraph excerpt from a computer printout containing numerous reports allegedly produced by Walpole officers during the murder investigation. Det. Dolan also identified a longer version of the summary of the evidence that he

---

[14]Mass. Gen. Laws ch. 276, § 23A (1998) provides in relevant part that "[w]henever a court is requested to issue a warrant," the clerk's office "shall enter" specified information about the individual who is the subject of the warrant "into a computer system to be known as the warrant management system. All warrants appearing in the warrant management system shall be accessible through the criminal justice information system, maintained by the criminal history systems board, to law enforcement agencies and the registry of motor vehicles. The warrant shall consist of sufficient information electronically appearing in the warrant management system, and a printout of the electronic warrant from the criminal justice information system shall constitute a true copy of the warrant."

-22-

drafted, but which the District Attorney requested that he shorten for submission with the warrant application. Burke insists that a jury could infer that the probable cause summaries in the computer print-out were created only after Burke's arrest.

In addition to the unsigned copy of the arrest warrant and Det. Dolan's summary of facts establishing probable cause, the police defendants have produced a copy of the application for a criminal complaint signed by Det. Dolan, on which the box marked "Warrant" has been checked and initialed by a magistrate; a copy of a summons and a complaint signed by the same magistrate, on each of which the box for entry of "RETURN DATE AND TIME" contains the word "warrant"; and a computer printout of Burke's criminal docket (stored in the Warrant Management System database and retrieved through the Criminal Justice Information System) showing a return of warrant at around 4:00 PM on December 10. Finally, the police defendants have produced a search warrant, obtained by Trooper Jennings, dated December 10 and signed by the same magistrate judge who signed and initialed the criminal complaint. The search warrant is accompanied by a six-page affidavit including a much more detailed summary of the facts allegedly establishing probable cause than the summary Det. Dolan testified that he provided in support of the arrest warrant.

We conclude that the defendants have produced substantial, though imperfect, evidence that a valid arrest warrant

issued upon a neutral magistrate's review of facts allegedly establishing probable cause. By contrast, Burke has adduced no evidence demonstrating that no warrant was issued apart from his own affidavit stating that he never saw a warrant. There is no requirement, either under the Constitution or under Massachusetts law, that a copy of the arrest warrant automatically be given to the person arrested at the time of the arrest. Burke's sworn statement, standing alone in the face of the defendants' submissions, cannot bear the evidentiary weight Burke seeks to give it. Because there is no genuine dispute regarding the question whether a valid arrest warrant was issued, the record fails to support Burke's allegation that he was deprived of his constitutional right to be arrested at home only upon issuance of a warrant.

## 2.      Existence of Probable Cause

While we must "pay substantial deference to judicial determinations of probable cause" made by a magistrate issuing a warrant, we "must still insist that the magistrate . . . not serve merely as a rubber stamp for the police." Aguilar v. Texas, 378 U.S. 108, 111 (1964), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213 (1983). Burke argues that even if a neutral magistrate issued a warrant for his arrest, he was nevertheless subjected to deprivation of his Fourth Amendment right because the "totality of the circumstances," Gates 462 U.S. at 238, as set

-24-

forth in the warrant application, was insufficient to establish probable cause for his arrest. See, e.g., United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996) ("The issuing magistrate ordinarily considers only the facts set forth in supporting affidavits accompanying [a search] warrant application.").[15]

"Probable cause determinations are, virtually by definition, preliminary and tentative." Acosta v. Ames Dep't Stores, Inc., 386 F.3d 5, 11 (1st Cir. 2004). The exact degree of certainty required to establish probable cause is difficult to quantify; it falls somewhere between "'bare suspicion' [and] what would be needed to 'justify . . . conviction.'" Valente, 332 F.3d at 32 (quoting Brinegar v. United States, 338 U.S. 160, 175 (1949)). As always, "[t]he touchstone of the Fourth Amendment is reasonableness." Florida v. Jimeno, 500 U.S. 248, 250 (1991). Probable cause thus exists if "the facts and circumstances within the relevant actors' knowledge and of which they had reasonably reliable information" would suffice to "warrant a prudent person in believing" that a person has committed or is about to commit a crime. Roche, 81 F.3d at 254.

The police defendants insist that the magistrate had before him ample facts and circumstances establishing probable

---

[15]Burke recognizes that the issuance of a valid arrest warrant bears significantly on the objective reasonableness of the police defendants' conduct even if there was no probable cause to arrest Burke, an issue we address below in Part III.C.

cause for Burke's arrest. Det. Dolan summarized the basis for probable cause in his application for an arrest warrant as follows:

> On 12-01-98 Irene Kennedy was brutally murdered in Bird Park. A State Police K-9 unit conducted a track from the victim. The K-9 [led] directly to Edmund Burke's front door [at his street address].
>
> Edmund was interviewed and he said that he had been sleeping all morning[.] Our investigation revealed two independent witnesses who saw him outside of his house in his yard on the morning of the murder. They also described the clothing he was wearing. He has denied owning clothing of this type.
>
> Edmund has changed his story several times during the course of this investigation to try and explain his actions. They are all inconsistent.
>
> Preliminary autopsy reports indicated that Irene Kennedy had been bitten on her breasts. These bites appear to be human. They were examined by Forensic Dentist Kate Crowley of the Medical Examiners Office and compared to impressions of Edmund Burke's teeth.
>
> She requested that Dr. [Lowell] Levine examine them also. He is the leading expert in the country and has testified as such[.] He is a Forensic Dentist with over thirty years of experience. He determined that the marks were bite marks made by human teeth. He has also determined with reasonable scientific certainty that [they] were made by Edmund Burke.
>
> Based on the above facts, there is probable cause to believe that Edmund Burke entered Bird Park on the morning of 12-1-98 and brutally murdered Irene Kennedy. I am requesting a warrant for his arrest for murder.

While Burke disputes the accuracy and reliability of all of the purported facts described in Det. Dolan's summary, he assails in particular the inclusion of an inaccurate inculpatory bite mark

opinion.  Bite mark evidence, Burke argues, is so unreliable that it could not reasonably support probable cause.

The existence of probable cause is based on the facts and circumstances known at the time of arrest rather than in hindsight. Roche, 81 F.3d at 254.  Moreover, forensic evidence relied upon by the police to establish probable cause to arrest need not be unassailably accurate.  "[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom."  Id. at 255.  Burke points to the affidavit of his own proposed trial expert, Dr. Richard R. Souviron, in which he states that "[b]ite mark evidence, if it is the only evidence of identity, cannot be used to positively identify a possible perpetrator to the exclusion of all others within a significant population."[16]  This categorical statement about the limited probative value of bite mark evidence to inculpate a suspect does not establish that Dr. Levine's specific bite mark comparison in this case failed to support probable cause when considered in light of the other available evidence.  In many types of forensic analysis, an "examiner can do

---

[16]The magistrate judge found Dr. Souviron's affidavit to be untimely filed after the deadline for disclosure of proposed expert testimony.  See Burke, 2003 U.S. Dist. LEXIS 24895 at *9 n.133. The magistrate judge nevertheless considered the affidavit for purposes of addressing Burke's claim that Dr. Levine intentionally fabricated or recklessly exaggerated his bite mark opinion.  We discuss that claim below in Part IV.B.1.

-27-

no more than speak of probabilities." Valente, 332 F.3d at 33 (handwriting comparison, "a less rigorous means of identification" than fingerprint analysis, may be used to support probable cause); see also Roche, 81 F.2d at 255 (inculpatory voice identification may support probable cause). The bite mark evidence was an appropriate factor to be weighed in the probable cause calculus, and the "totality of the circumstances," Gates, 462 U.S. at 238, as stated in Det. Dolan's summary in support of the arrest warrant application, sufficiently established probable cause.

### 3. Misleading Warrant Application Submitted with Intentional or Reckless Disregard for the Truth

Burke alleges that even if a valid arrest warrant was issued on the basis of an application that set forth sufficient facts and circumstances to establish probable cause, the police defendants nevertheless violated his Fourth Amendment right. Burke alleges that the police defendants, with intentional or reckless disregard for the truth, included inculpatory bite mark evidence that they knew or had reason to know was inaccurate in the warrant application and excluded exculpatory DNA evidence that would have eliminated probable cause from the same application, thereby requiring the magistrate to make his probable cause decision on the basis of a tainted submission.

"A Fourth Amendment violation may be established if a [plaintiff] can show that officers acted in reckless disregard, with a 'high degree of awareness of [the] probable falsity'" of

-28-

statements made in support of an arrest warrant.  Forest v. Pawtucket Police Dep't, 377 F.3d 52, 58 (1st Cir. 2004) (citation omitted), cert. denied, 2005 U.S. LEXIS 1507 (Feb. 22, 2005).  Similarly, the intentional or reckless omission of material exculpatory facts from information presented to a magistrate may also amount to a Fourth Amendment violation.  DeLoach v. Bevers, 922 F.2d 618, 622 (10th Cir. 1990) (upholding verdict for plaintiff where jury could have inferred that defendant police detective deliberately or recklessly excluded the exculpatory opinion of an important medical expert from the affidavit).  Reckless disregard for the truth in the submission of a warrant application may be established where an officer "in fact entertained serious doubts as to the truth of the allegations" or where "circumstances evinc[ed] obvious reasons to doubt the veracity of the allegations" in the application.  United States v. Ranney, 298 F.3d 74, 78 (1st Cir. 2002) (internal quotation marks omitted).  In the case of allegedly material omissions, "recklessness may be inferred where the omitted information was critical to the probable cause determination." Golino v. New Haven, 950 F.2d 864, 871 (2d Cir. 1991); see also Wilson v. Russo, 212 F.3d 781, 783 (3d Cir. 2000) ("omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know" when deciding whether to issue a warrant).

Allegations of intentional or reckless misstatements or omissions implicate the very truthfulness, not just the sufficiency, of a warrant application. If such allegations prove to be true, a court owes no deference to a magistrate's decision to issue an arrest warrant because, "where officers procuring a warrant have deliberately misled the magistrate about relevant information, no magistrate will have made a prior probable cause determination" based on the correct version of the material facts. Velardi v. Walsh, 40 F.3d 569, 574 n.1 (2d Cir. 1994).

The requirement that the contested facts included in or omitted from a warrant application be material to the probable cause determination to establish a Fourth Amendment violation derives from the standard announced for the suppression of evidence in Franks v. Delaware, 438 U.S. 154 (1978). There, the Supreme Court held that a criminal defendant who establishes that a police officer procured a search warrant by intentionally or recklessly making materially false statements in a supporting affidavit is entitled to the suppression of evidence so long as "the remaining content [in the affidavit] is insufficient" to support probable cause. Id. at 156. Appellate courts have consistently held that the Franks standard for suppression of evidence informs the scope of qualified immunity in a civil damages suit against officers who allegedly procure a warrant based on an untruthful application. See, e.g., Aponte Matos v. Toledo-Dávila, 135 F.3d 182, 185 (1st

-30-

Cir. 1998) (where allegedly false statement was necessary to establish probable cause, defendant "will not be protected by qualified immunity" if plaintiffs prevail at trial on claim that defendant lied in search warrant application); Olson v. Tyler, 771 F.2d 277, 282 (7th Cir. 1985) ("Where the judicial finding of probable cause is based solely on information the officer knew to be false or would have known was false had he not recklessly disregarded the truth, not only does the arrest violate the fourth amendment, but the officer will not be entitled to [qualified] immunity."). As in the suppression context, "[t]o determine . . . materiality of the misstatements and omissions, we excise the offending inaccuracies and insert the facts recklessly omitted, and then determine whether or not the 'corrected' warrant affidavit would establish probable cause." Wilson, 212 F.3d at 789.

a.      Inclusion of Inaccurate Bite Mark Evidence

Burke argues that the police defendants should have known that Dr. Levine's bite mark opinion was inaccurate and unreliable,[17] and that they acted with reckless disregard for the truth by including that evidence in the arrest warrant application.[18] As we have discussed, bite mark evidence may be considered as a factor in

---

[17]We discuss and reject Burke's independent claims that Drs. Levine and Crowley intentionally or recklessly fabricated inculpatory bite mark evidence below in Part IV.

[18]The police defendants do not dispute that Dr. Levine's bite mark opinion was central to the existence of probable cause.

the probable cause analysis. The summary filed by Det. Dolan along with his application for an arrest warrant describes Dr. Levine as "the leading expert in the country [who] has testified as such[.] He is a Forensic Dentist with over thirty years of experience." While Burke assails the reliability of bite mark analysis generally, he does not dispute Dr. Levine's credentials or point to any evidence that the police had any reason to doubt Dr. Levine's opinion. Burke thus fails to establish that "circumstances evinc[ed] obvious reasons to doubt the veracity" of the inculpatory bite mark evidence, and fails to preserve a genuine dispute on his claim that inaccurate evidence was recklessly included in the warrant application in violation of his Fourth Amendment rights. Ranney, 298 F.3d at 78 (internal quotation marks and citations omitted).[19]

---

[19]While Det. Dolan's probable cause summary relates that Dr. Levine found a match "with reasonable scientific certainty" with respect to both bite marks, Dr. Levine maintains that he rendered his opinion to this degree of certainty only with respect to the bite mark on the victim's left breast. See infra Part IV.B.1. The affidavit in support of a search warrant produced by Sgt. Shea and Trooper Jennings, upon which Det. Dolan relied in preparing his arrest warrant application, also states that Dr. Levine rendered an opinion to a "reasonable degree of scientific certainty that both bite marks found on the body . . . were caused by Edmund Burke" (emphasis added). Sgt. Shea testified that he asked Trooper McDonald to call Dr. Levine "and get the exact wording" of his bite mark opinion for inclusion in the search warrant affidavit. Trooper McDonald, in turn, testified at his deposition that Dr. Levine gave his opinion to a "reasonable degree of scientific certainty," but that Dr. Levine could have said "[bite] mark or marks, I don't know." Burke does not specifically allege on appeal that Trooper McDonald intentionally or recklessly misrepresented Dr. Levine's bite mark opinion, rendered with a "reasonable degree

-32-

b.    Omission of Exculpatory DNA Analysis Results

Burke's most serious challenge to his arrest involves his claim that crucial exculpatory DNA evidence was known to the police at the time of his arrest but omitted from Det. Dolan's statement of probable cause, thus precluding review by a neutral magistrate of all the facts material to the existence of probable cause. Burke argues that the inculpatory bite mark evidence could not rationally co-exist with the exculpatory DNA evidence in his case. Given the greater certainty of the DNA analysis results, he argues, the inclusion of those results in the warrant application would have eliminated probable cause.  Moreover, Burke argues, because the exculpatory DNA evidence was "critical to the probable cause determination," Golino, 950 F.2d at 871, a reasonable jury could infer that its omission from the warrant application submitted to the magistrate was made with deliberate or reckless disregard for the truth.

Maine Crime Lab chemist Calicchio's uncontroverted deposition testimony was that DNA analysis may exclude a person as a source of DNA with virtual certainty: "We like to say an exclusion is absolute."  In a report dated December 12, Calicchio memorialized the DNA results she had communicated by telephone to Trooper McDonald:

---

of scientific certainty," as referring to two bite marks rather than one.

A mixture of male and female DNA profiles was obtained from the breast swabbings (Items #1A and 1B). The predominant DNA profile matches the DNA profile of Irene Kennedy. The minor component of the DNA profile does not match the DNA profile of Edmund Burke.

According to these results, Burke could not have been the source of the bite mark on the victim's left breast unless he bit the victim without leaving his own DNA behind and another man somehow deposited his DNA in the bite mark without producing a bite mark of his own.[20] Based on the combination of forensic evidence available in this case, a reasonable jury assessing the "totality of the circumstances," Gates, 462 U.S. at 238, could find that the DNA evidence was "so probative [it] would vitiate probable cause," and that its omission reflected at least reckless disregard for the truth. DeLoach, 922 F.2d at 623.

Of course, for purposes of the probable cause analysis, the exculpatory DNA evidence must also have been known to the police at the time of the warrant application. See Roche, 81 F.3d at 254. Burke alleges that at least one officer central to the investigation, Trooper McDonald, knew that DNA analysis had conclusively excluded him as the source of the saliva in the bite mark and, consequently, as the murderer, as early as four hours prior to Burke's arrest, and two hours before any warrant applications were prepared. Calicchio's contemporaneous notes show

---

[20]Only the bite mark on the victim's left breast was swabbed for DNA testing.

that Trooper McDonald called her at 11:00 AM on December 10 to find out the DNA analysis results.[21] About two hours later, at 1:15 PM, Trooper McDonald communicated Dr. Levine's bite mark opinion, but not the DNA results, to Sgt. Shea and Trooper Jennings for inclusion in an affidavit in support of a search warrant. Trooper McDonald testified at his deposition that he also communicated Dr. Levine's bite mark opinion to Det. Dolan at some point, and that Det. Dolan would have relied on the information in the search warrant affidavit to prepare his arrest warrant application.

In contrast to Calicchio's account, Trooper McDonald testified at deposition that he did not receive the DNA results until the day after Burke's arrest, and that he immediately communicated the exculpatory results, through Sgt. Shea, to the prosecutor during Burke's arraignment. Calicchio's notes document only one phone conversation on December 11 relating to the case, with Massachusetts Crime Lab chemist Richard Iawicci, who called

---

[21]Calicchio explained at deposition that she routinely documents business-related phone calls by writing down the date, time, and general subject matter of incoming and outgoing calls. She also testified that she knew the Kennedy murder case was a high priority, and that she would have contacted Trooper McDonald as soon as the DNA results were available. Based on computer records printed and dated during the DNA analysis, Calicchio testified that she knew the exculpatory results as early as 9:00 AM on December 10. Calicchio's notes also show that she spoke to Trooper McDonald on December 9 to notify him that the samples contained sufficient DNA to test and that she would call him the next day with the results.

her at 11:15 AM, after the DNA results were disclosed during Burke's arraignment.

Viewing the evidence in the light most favorable to Burke, the record supports the inference that exculpatory DNA analysis that directly contradicted the inculpatory bite mark evidence was known to at least one officer centrally involved in the investigation, and was intentionally or recklessly withheld from the officer who was actually preparing the warrant application, resulting in its omission from the application. Accordingly, for purposes of the summary judgment analysis, and in answer to the first question of the qualified immunity inquiry, Burke has proffered evidence sufficient to support a finding that he was arrested without probable cause in violation of his Fourth Amendment right. See Limone, 372 F.3d at 44 (first question in qualified immunity analysis is "whether the plaintiff's allegations, if true, establish a constitutional violation"). Whether any of the police defendants may be liable for damages resulting from this constitutional violation turns on the balance of the qualified immunity inquiry.[22]

_____

[22]Neither the magistrate judge nor the district court designated the grants of summary judgment to the police defendants as grants of qualified immunity based on Burke's failure to establish a constitutional violation. The magistrate judge recommended, however, that even if Burke did establish such a violation, Det. Dolan, Sgt. Shea, and Trooper McDonald should receive qualified immunity on the ground that their conduct was objectively reasonable under clearly established law. See Burke, 2003 U.S. Dist. LEXIS 24897, at *25 (Det. Dolan); Burke, 2003 U.S.

**B.        Clearly Established Law**

The second prong of the qualified immunity inquiry "focus[es] on whether [an] officer had fair notice that [his] conduct was unlawful." Brosseau v. Haugen, 125 S. Ct. 596, 599 (2004).  Uniquely among the defendant police officers, Trooper McDonald argues that he had no constitutional duty to disclose exculpatory evidence to anyone because he was neither an affiant for the arrest warrant nor technically an arresting officer (merely a searching officer).  Thus, we must ask "whether the state of the law at the time of the putative violation afforded [Trooper McDonald] fair warning that his . . . conduct was unconstitutional." Limone, 372 F.3d at 45.[23]

"It has long been well established that . . . a material fabrication [in a warrant application] violates the Warrant Clause of the Fourth Amendment." Aponte Matos, 135 F.3d at 185.  As the

_____

Dist. LEXIS 24896, at *31, *41 (Sgt. Shea and Trooper McDonald). The magistrate judge also determined that Det. Bausch was neither an affiant for the arrest warrant nor an arresting officer and therefore bore no liability regardless of whether Burke established a constitutional violation. Burke, 2003 U.S. Dist. LEXIS 24897, at *31.  The statement of undisputed facts submitted by the MSP defendants, including Sgt. Shea, who was admittedly an arresting officer, lists Det. Bausch as the only other arresting officer. Viewing the facts in the light most favorable to Burke, we consider Det. Bausch to be one of the officers who arrested Burke and reach his qualified immunity defense.

[23]The other police defendants raise no argument about the absence of clearly established law.  Instead, they focus on the third prong of the qualified immunity analysis, asserting that there was nothing unreasonable about their conduct.  We address this argument in Part III.C.

Supreme Court explained in Franks, "[when] the Fourth Amendment demands a factual showing sufficient to comprise 'probable cause,' the obvious assumption is that there will be a truthful showing." 438 U.S. at 164-65 (quotation marks and citation omitted) (emphasis in original). In the absence of such a requirement, the interposition of an objective magistrate into the arrest process would serve little purpose. This court has also applied the Franks standard to material omissions from a warrant application, which are likewise prohibited by the Fourth Amendment. See United States v. Rumney, 867 F.2d 714, 720 (1st Cir. 1989).

Because Franks involved allegations that an affidavit in support of a search warrant contained false statements by the affiant, the Court's ruling requiring suppression of evidence procured through a misleading warrant application spoke in terms of impeachment only "of the affiant, not of any nongovernmental informant." 438 U.S. at 171. The Supreme Court later clarified, however, that courts deciding motions to suppress evidence despite the issuance of a valid warrant must "consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable-cause determination." United States v. Leon, 468 U.S. 897, 923 n. 24 (1984). Just as a police officer who seeks an arrest warrant despite the lack of probable cause may not "excuse his own default by pointing to the

greater incompetence of [a] magistrate" who erroneously issues a warrant, Malley, 475 U.S. at 346 n.9, a police defendant who acts intentionally or with reckless disregard for the truth may not insulate himself from liability through the objectively reasonable conduct of other officers. See Leon, 468 U.S. at 923 n.24 ("Nothing in our opinion suggests, for example, that an officer could obtain a warrant" based on an insufficient affidavit "and then rely on colleagues who are ignorant of the circumstances under which the warrant was obtained to conduct the search.").

Thus, Trooper McDonald's argument that he had no constitutional duty to disclose exculpatory evidence to anyone prior to Burke's arrest because he was neither an affiant for the arrest warrant nor technically an arresting officer is unavailing. However Trooper McDonald chooses to characterize or minimize his role, the summary judgment record establishes that he was centrally involved in the collection of evidence to be used to secure an arrest warrant for Burke.[24]  At the time of Burke's arrest, his

---

[24]Significantly, the record shows that Walpole officers were not involved in the collection or analysis of forensic evidence during the murder investigation.  At the same time, Sgt. Shea of the Massachusetts State Police testified at deposition that the existing practice was to have a local officer apply for the arrest warrant: "[W]henever we . . . arrest somebody for murder, the local [police department] does the arrest warrant.  It is common."  Under these circumstances, on Trooper McDonald's theory, any MSP Trooper -- as the only possible source of forensic evidence in support of a local officer's application for an arrest warrant -- could easily fabricate forensic evidence to procure a warrant in violation of a suspect's Fourth Amendment rights while insulating himself against civil suit in his personal capacity for damages.

constitutional right to be free from arrest pursuant to a warrant that would not have issued if material exculpatory evidence had been provided to the magistrate was clearly established, as was Trooper McDonald's concomitant constitutional duty of full disclosure of exculpatory information to fellow officers seeking warrants based on probable cause.

**C.        The Police Defendants' Allegedly Unconstitutional Conduct**

The third prong of the qualified immunity analysis "channels the analysis from abstract principles to the specific facts of a given case." Cox, 391 F.3d at 31. Because "[t]he concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct," Saucier v. Katz, 533 U.S. 194, 205 (2001), even where a plaintiff has shown, for purposes of withstanding summary judgment, that a government official may have deprived him of a clearly established constitutional right, qualified immunity remains available to defendants who demonstrate that they acted objectively reasonably in applying clearly established law to the specific facts they faced. Having determined for the purpose of the qualified immunity analysis that Burke was arrested pursuant to a warrant issued because of reckless or intentional omissions of material facts from the warrant application (the constitutional violation), we proceed to analyze each police defendant's individual conduct in this case, focusing on whether each

"officer's mistake as to what the law requires [was] reasonable."
Id.

        a.      Det. Dolan, Det. Bausch, and Sgt. Shea

The record fails to support any reasonable inference that Det. Dolan, who obtained the arrest warrant, or Sgt. Shea and Det. Bausch, the arresting officers, had any knowledge of or reason to know about the exculpatory DNA results prior to Burke's arrest. Nor did they have any reason to doubt the reliability of Dr. Levine's bite mark opinion.

It is objectively reasonable for officers to seek an arrest warrant "so long as the presence of probable cause is at least arguable." Prokey v. Watkins, 942 F.2d 67, 72 (1st Cir. 1991). Because the facts known to Det. Dolan, as set forth in his summary of probable cause, formed a plausible basis for seeking an arrest warrant, he is entitled to qualified immunity. Similarly, "[w]hen officers make an arrest subject to a warrant . . . even if probable cause is lacking, [they] are entitled to qualified immunity unless the warrant application is so lacking in indicia of probable cause as to render official belief in its existence unreasonable." Abreu-Guzman v. Ford, 241 F.3d 69, 73 (1st Cir. 2001) (internal quotation marks omitted). Both Det. Bausch and Sgt. Shea reasonably relied on the existence of an apparently valid warrant and are therefore entitled to qualified immunity.

-41-

b.    Trooper McDonald

When viewed in Burke's favor, the facts in the record reveal that Trooper McDonald knew the DNA analysis had excluded Burke as a suspect on the morning of December 10, but failed to communicate that information to the officers preparing applications for search and arrest warrants despite his awareness of their ongoing preparation and ample opportunity to communicate the newly acquired information.  Trooper McDonald's deposition testimony reveals that he relayed Dr. Levine's inculpatory bite mark opinion to Trooper Jennings and Sgt. Shea for inclusion in their affidavit in support of a search warrant about two hours after he received the DNA results from Calicchio, and that he was aware that Det. Dolan would rely on the information in the search warrant affidavit to prepare an arrest warrant application.[25]

While Trooper McDonald testified at his deposition that he received the DNA results on the day after Burke's arrest, he also testified that he knew their exculpatory significance and that he immediately communicated the results, through Sgt. Shea, to the prosecution.  At his deposition, Trooper McDonald responded to questioning as follows:

---

[25]Trooper McDonald also testified at deposition that he communicated Dr. Levine's inculpatory bite mark opinion to Det. Dolan at some point during the investigation, but he could not recall whether this occurred before or after Det. Dolan applied for the arrest warrant.

A.  I  spoke  with  the  Maine  state  police
directly, the lab.

Q. And they told you they excluded [Burke]?

A. Excluded.  The profile doesn't match.

[. . .]

Q. And it's your testimony you communicated
that immediately to [the prosecution]?

A. Yes.

Trooper McDonald also testified that when he found out the results
of the DNA analysis, he called Dr. Levine to ask whether he still
stood by his bite mark opinion in light of the conflicting DNA
results.[26]  The record thus shows that Trooper McDonald "correctly
perceive[d] all of the relevant facts," Saucier, 533 U.S. at 195,
including the DNA results and their exculpatory significance.

Given the clearly established prohibition on material
omissions by officers central to an investigation from an arrest
warrant application, and given Trooper McDonald's knowledge of the
crucial facts, we cannot say, as a matter of law, that a
reasonable, similarly situated officer would feel free to
communicate only inculpatory bite mark evidence to fellow officers
seeking warrants on probable cause while withholding his knowledge
of directly contradictory DNA results.  Accordingly, Trooper

---

[26]Dr. Levine testified that he received a call from Trooper
McDonald about the DNA analysis a day or so after rendering his
bite mark opinion on December 10.

McDonald was not entitled to a favorable summary judgment ruling on his qualified immunity defense.

## IV. CLAIMS AGAINST THE FORENSIC ODONTOLOGISTS

**A.        Under Color of State Law**

Dr. Levine argues that he is entitled to summary judgment because he was not acting "under color of state law" within the meaning of 42 U.S.C. § 1983 in his capacity as an independent consultant to the District Attorney's office or, alternatively, that if he was acting under color of state law, he is nevertheless entitled to immunity from suit.  Private citizens may be liable for acts and omissions committed "under color of state law" where they are "jointly engaged with state officials in the prohibited action."  Lugar v. Edmondson Oil Co., 457 U.S. 922, 941 (1982) (citation omitted).  "A private party's conduct is attributable to the state if the state has so far insinuated itself into a position of interdependence with [the private party] that it must be recognized as a joint participant in the challenged activity." Camilo-Robles v. Hoyos, 151 F.3d 1, 10 (1st Cir. 1998) (internal quotation marks and citation omitted, alteration in original).

Dr. Levine rendered a bite mark opinion only because the Norfolk District Attorney's Office, at the recommendation of the state's own forensic odontologist, sought his assistance with the

analysis of forensic evidence in a criminal investigation.[27]  As a result, Dr. Levine is "both subject to suit under section 1983 and eligible for the balm of qualified immunity."  Id. (private psychiatrists under contract with the police department to evaluate officers' mental health are state actors and entitled to qualified immunity); see also Rodriques v. Furtado, 950 F.2d 805, 815 (1st Cir. 1991) (private physician from whom police requested assistance in conducting a body cavity search pursuant to a search warrant entitled to qualified immunity).  We turn, then, to the initial question in the qualified immunity analysis, whether "all the uncontested facts and any contested facts looked at in [Burke's] favor" allege a constitutional violation.  Riverdale Mills Corp., 392 F.3d at 62.

B.        **Deprivation of a Constitutional Right**

Burke alleges that Dr. Levine and Dr. Crowley each deprived him of his independent constitutional right to be free from arrest on the basis of knowingly or recklessly exaggerated inculpatory bite mark evidence.  While the police defendants may have had no reason to doubt the accuracy of the bite mark evidence included in the arrest warrant application, Burke asserts that both Dr. Levine and Dr. Crowley had ample reason to doubt the validity

---

[27]Dr. Crowley does not dispute that she acted under color of state law.

of their own bite mark analyses for use in determining the existence of probable cause.[28]

The intentional or reckless fabrication of inculpatory evidence or omission of material exculpatory evidence by a forensic examiner in support of probable cause may amount to a constitutional violation. See Galbraith v. Cty. of Santa Clara, 307 F.3d 1119, 1126 (9th Cir. 2002) ("[A] coroner's reckless or intentional falsification of an autopsy report that plays a material role in the false arrest and prosecution of an individual can support a claim under 42 U.S.C. § 1983 and the Fourth Amendment."); Pierce v. Gilchrist, 359 F.3d 1279, 1296 (10th Cir. 2004) (plaintiff alleging post-arrest fabrication of hair sample opinion states a claim against forensic chemist for unconstitutional prosecution, of which one element is lack of probable cause). We thus inquire whether the facts in the record, when viewed in the light most favorable to Burke, permit the inference that either Dr. Levine or Dr. Crowley rendered a bite mark opinion with deliberate falsity or reckless disregard for the truth.

To support his allegations, Burke must show that Dr. Levine or Dr. Crowley "in fact entertained serious doubts as to the

---

[28]The record reveals no evidence that either Dr. Levine or Dr. Crowley knew the exculpatory DNA analysis results prior to Burke's arrest; accordingly, we exclude the DNA results from our analysis of Burke's claims against them.

truth" of their bite mark opinions or that "circumstances evinc[ed] obvious reasons to doubt the veracity" of those results. Ranney, 298 F.3d at 78 (internal quotation marks omitted). To constitute a Fourth Amendment violation, the allegedly fabricated or exaggerated evidence must also be material to the probable cause determination. See, e.g., Pierce, 359 F.3d at 1287-88 (on motion to dismiss claim of unconstitutional prosecution, "we cannot say that the false information supplied by [forensic chemist] and the accurate exculpatory information disregarded by [her] were not significant enough to prejudice [plaintiff's] constitutional rights"); Aponte Matos, 135 F.3d at 185 (police officer's "material fabrication [in a warrant application] violates the Warrant Clause of the Fourth Amendment.").

1.    Dr. Levine

Burke alleges that Dr. Levine acted with deliberate or reckless disregard for the truth by overstating the degree of certainty with which the mold of Burke's teeth matched the bite mark on the victim's left breast.[29] Burke attempts to demonstrate that Dr. Levine was at least reckless by (1) referring to Dr.

_____

[29]While Trooper McDonald testified at his deposition that he believed Dr. Levine had rendered an opinion that both bite marks matched Burke's teeth to a "reasonable degree of scientific certainty," see supra note 19, Burke does not ground his argument on Dr. Levine's communication of an opinion on both bite marks to a "reasonable degree of scientific certainty," focusing instead on Dr. Levine's opinion regarding the bite mark on the victim's left breast.

Levine's own statements made during the instant litigation, (2) assailing the terminology with which Dr. Levine rendered his opinion before Burke's arrest, and (3) referring to the statements of Burke's own expert witness regarding the process of bite mark analysis.

Burke points to Dr. Levine's affidavit, filed on March 16, 2000 in support of a motion to dismiss Burke's claims against him for lack of personal jurisdiction (based on Dr. Levine's New York residence and alleged lack of contacts with Massachusetts). In his affidavit, Dr. Levine stated that he told police investigators on December 10, 1998 that he "could not rule out Mr. Burke" as a source of the bite marks. At their depositions, Chief Betro and Trooper McDonald indicated that they viewed this affidavit as effectively disavowing the opinion that Dr. Levine had rendered for them with a "reasonable degree of scientific certainty" prior to Burke's arrest.

On July 7, 2000, Dr. Levine supplemented his affidavit of March 16, 2000 to clarify that on December 10, 1998, "I could not rule out Mr. Burke as a suspect. Both of the two bite marks on [the victim's] body were consistent with his dentition. One of the bite marks was consistent with his dentition to a high level of probability, or a reasonable degree of scientific certainty." Dr. Levine thus does not deny that he rendered his opinion on December 10, 1998 about the bite mark on the victim's left breast with a

-48-

"reasonable degree of scientific certainty."  At the same time, there is a significant difference between opining to a "reasonable degree of scientific certainty" that Burke's teeth matched one of the bite marks and simply opining that "I could not rule out Mr. Burke as a suspect," both of which statements are included in Dr. Levine's July 7, 2000 affidavit.  Dr. Levine maintains that the opinion he communicated to police on December 10, 1998 to a "reasonable degree of scientific certainty" before Burke's arrest was and remains accurate.  At his deposition, Dr. Levine demonstrated his bite mark analysis methodology by comparing the mold of Burke's teeth with the enlarged photographs and testified that he adhered to his original opinion that Burke's teeth matched the bite mark on the victim's left breast to a reasonable degree of scientific certainty.

Still, Burke asserts that Dr. Levine used the phrase "reasonable degree of scientific certainty" when, as revealed by the clarifying affidavit of July 7, 2000, he in fact meant a "high level of probability."  Burke argues that Dr. Levine's misuse of terminology exhibited reckless disregard for his obligation to communicate his actual level of certainty about the bite mark match.  "'Reasonable degree of scientific certainty' is a plastic phrase."  Buie v. McAdory, 341 F.3d 623, 625 (7th Cir. 2003).  That fact is evident from Dr. Levine's attempts to explain the meaning he assigns to the term.  At his deposition, Dr. Levine testified

-49-

that he uses "reasonable degree of scientific certainty" to mean "high degree of probability," a higher standard than "could not rule out as a suspect." Dr. Levine's explanation of his terminology comports with the non-binding "Bite-Mark Terminology Guidelines" of the American Board of Forensic Odontologists ("ABFO"), of which Dr. Levine is a founding diplomate and member, which equate the related terms "reasonable medical certainty" and "high degree of certainty." As Burke points out, however, the guidelines further define both terms to mean "virtual certainty; no reasonable or practical possibility that someone else did it."[30] By using the term "reasonable degree of scientific certainty," Burke reasons, Dr. Levine communicated a higher degree of certainty ("virtual certainty," according to a passage in the ABFO guidelines) than he actually felt (only that he "could not rule out Mr. Burke as a suspect," according to his March 16, 2000

---

[30]The "Bite-Mark Terminology Guidelines," adopted by the American Board of Forensic Odontologists in 1995, thus conflate several arguably distinct levels of certainty ("reasonable medical certainty," "high degree of certainty," and "virtual certainty") into the same high standard. The guidelines further describe "reasonable medical certainty" as

> convey[ing] the connotation of <u>virtual certainty or beyond reasonable doubt</u>. The term deliberately avoids the message of unconditional certainty only in deference to the scientific maxim that one can never be absolutely positive unless everyone in the world was examined or the expert was an eye witness.

(Emphasis added.)

affidavit).  At his deposition, Dr. Levine "clarified" that while he uses "reasonable degree of scientific certainty" and "high degree of probability" interchangeably, his left breast bite mark opinion never met the high standard of the ABFO guidelines' definition of "reasonable medical certainty" -- namely, that there was "no reasonable or practical possibility that someone else" other than Burke made the bite mark on the victim's left breast.

We need not determine whether Dr. Levine's terminology or the terminology recommended by the ABFO guidelines is correct. Neither the ABFO guidelines' definition nor Dr. Levine's alternate term, "high degree of probability," appears in Det. Dolan's summary of probable cause in the arrest warrant application.  The summary merely states that Dr. Levine "determined with reasonable scientific certainty that [the bite marks] were made by Edmund Burke."  In the absence of any indication to the contrary, we must assume that the magistrate who issued the arrest warrant assigned no more than the commonly accepted meaning among lawyers and judges to the term "reasonable degree of scientific certainty" -- "a standard requiring a showing that the injury was more likely than not caused by a particular stimulus, based on the general consensus of recognized [scientific] thought."  Black's Law Dictionary 1294 (8th ed. 2004) (defining "reasonable medical probability," or "reasonable medical certainty," as used in tort actions).  That standard, of course, is fully consistent with the probable cause

-51-

standard.  See Roche, 81 F.3d at 254 ("By definition, the determination [of probable cause] does not require scientific certainty.").

Finally, Burke relies on the affidavit of his own chosen expert, Dr. Souviron, which states that bite mark evidence alone cannot be used to "positively identify a possible perpetrator to the exclusion of all others within a significant population."[31] The record does not support the inference that Dr. Levine communicated, or risked communicating, that Burke was the source of the bite mark "to the exclusion of all others within a significant population." Rather, he opined that Burke's teeth matched the bite mark to a "reasonable degree of scientific certainty" without specifying the number of individuals who could have made the same bite mark. Dr. Souviron was unable to render his own independent opinion comparing the mold of Burke's teeth to the photographs of the bite mark because, he explained, "[b]ased on my knowledge and expertise, I concluded that the photographs I was provided with were not the photographs that were used originally to make the evaluation of this case. . . . I would need the particular photographs in order to be able to perform any in-depth identification." Burke points

_____

[31]As we have noted, the magistrate judge considered the affidavit to be untimely filed after the deadline for disclosure of proposed expert testimony. Nevertheless, the magistrate judge considered the affidavit and found that it did not establish that Dr. Levine recklessly or deliberately rendered a false bite mark opinion. See Burke, 2003 U.S. Dist. LEXIS 24895 at *9 n.133.

out that copies of the enlarged photographs were not made available to him during discovery through no fault of his own. But even a contrary expert opinion from Dr. Souviron based on the exact same materials used by Dr. Levine would not necessarily shed any light on how Dr. Levine performed his own analysis and arrived at his own conclusions at the time he rendered his bite mark opinion.

Viewing the evidence in the light most favorable to Burke, we conclude that the record reveals no support for an inference that Dr. Levine's methodology or judgment were so clearly flawed that he should have harbored serious doubts about the reliability of his resulting opinion. Because Burke has failed to generate a genuine dispute on the threshold question of whether Dr. Levine violated his Fourth Amendment rights by rendering his bite mark opinion with deliberate or reckless disregard for the truth, Dr. Levine is entitled to summary judgment on the ground of qualified immunity.

### 2. Dr. Crowley

Burke alleges that Dr. Crowley also intentionally fabricated or recklessly exaggerated an inculpatory bite mark opinion in support of probable cause. Burke highlights Dr. Crowley's deposition testimony that although she was professionally interested in the field of bite mark analysis and regarded Dr. Levine as a mentor, she was trained only as a dentist and had no experience in bite mark analysis. Rather, her experience as a

forensic odontologist was limited to identifying human remains through comparison with dental records. Burke maintains that any bite mark opinion Dr. Crowley rendered would have reflected at a minimum her reckless disregard for the truth because she knew she was not qualified to perform such an analysis.

Dr. Crowley insists that she never formed a bite mark opinion in support of probable cause. At deposition, Dr. Crowley testified that while she examined the mold of Burke's teeth and the bite mark on the victim, she did not make any comparisons: "I never concluded that there was a match. I made some observations." She also stated that she made transparencies and impressions of Burke's teeth and the bite mark, but that she used these materials only as learning tools. In short, Dr. Crowley testified that her role in the investigation was limited to that of collecting and preserving the bite mark evidence, including making the mold of Burke's teeth, a task that dentists routinely perform.[32]

Burke counters that Dr. Crowley did render a bite mark opinion in support of probable cause. He points to the deposition testimony of Dr. Levine and Lt. Kenneth Martin, an investigator with MSP Crime Scene Services, indicating that Dr. Crowley agreed with Dr. Levine's bite mark opinion. Dr. Levine testified that he was surprised to find out that Dr. Crowley had no experience in

_____

[32]Burke does not dispute that Dr. Crowley competently made the mold of his teeth.

bite mark analysis, and that he had the impression that she shared his initial opinion formed in Albany on December 6 as well as his observations made at the Medical Examiner's Office in Boston on December 9.[33]  Lt. Martin testified at deposition that he believed Dr. Crowley would be the primary person testifying about the bite mark evidence at a criminal trial and that Dr. Levine would be consulted to give a second opinion.  He further stated that he knew Dr. Crowley had never testified at a trial about bite mark analysis, but that he had no reason to think she was not qualified to do so, given her examination of the actual bite mark and the unenhanced photographs,[34] his understanding that "she had had previous training under Lowell Levine who is recognized as a forensic odontologist," and her job qualifications.

Viewing the evidence in the light most favorable to Burke, the record fails to support Burke's allegation that Dr. Crowley actually communicated a bite mark opinion to the police investigators for use in Det. Dolan's arrest warrant application.

---

[33]Trooper McDonald testified at his deposition that he shared Dr. Levine's general impression that Dr. Crowley agreed with his initial conclusions made in Albany on December 6.

[34]Dr. Crowley maintains that she never saw the enhanced photographs that Trooper McDonald and Sgt. Shea delivered to Dr. Levine in Albany late in the evening of December 9.  Dr. Crowley did not accompany the officers on this second trip to Albany, nor was she present when Dr. Levine gave instructions to the photo lab in Boston on how to enlarge the photographs.  However, Lt. Martin mentioned "the digital enhancements" of the photographs as being among the items he believed Dr. Crowley examined.

Nor does the record indicate that the police investigators sought or relied upon Dr. Crowley's opinion after Dr. Levine became involved in the investigation.

Even if we were required to take a different view of the evidence (and we are not), Dr. Crowley's communication of a bite mark opinion, without more, would not amount to reckless exaggeration, much less intentional fabrication, of bite mark evidence. Dr. Crowley herself advised the District Attorney to hire Dr. Levine as an expert. Given her knowledge of Dr. Levine's credentials, as well as her own, albeit limited, knowledge of forensic odontology, no rational jury could find that an opinion from Dr. Crowley merely concurring in Dr. Levine's bite mark opinion would be based on such dubious premises that it would manifest reckless disregard for the truth.

Because Burke has failed to establish a genuine issue of material fact on the initial question of whether Dr. Crowley deprived him of his Fourth Amendment right, Dr. Crowley is entitled to summary judgment on the ground of qualified immunity.

## V. DEFAMATION CLAIM

Burke alleges that Walpole Police Chief Betro defamed him by falsely and publicly attributing Kennedy's murder to him.[35]

---

[35]Burke styles his defamation claim as being brought pursuant to § 1983. Discerning no federal right affected by Chief Betro's public statements, we analyze Burke's claim under the Massachusetts law of defamation, as did the district court.

According to the deposition testimony of a reporter for the Daily Transcript, a regional newspaper, Chief Betro made an appearance in his official capacity at a public meeting organized by the East Walpole Civic Association on or about January 13, 1999, after the exculpatory DNA results became public and while Burke was awaiting release to house arrest. Approximately two dozen citizens, fearful that the murderer was still at large, attended the meeting. The Boston Herald, relying on an article in the Daily Transcript, reported on January 25, 1999 that Chief Betro assured the audience, "I can tell you we've got the right man."[36]

Chief Betro then advanced a theory to explain how Burke could be the killer despite having been excluded as a source of the foreign DNA found in the bite mark on the victim's breast. According to the Boston Herald, again relying on the Daily Transcript, "[Chief] Betro . . . told the crowd that an orange juice container was found about 40 feet from Kennedy's body, and it was possible Burke drank the orange juice and washed away any DNA samples in his mouth." The Boston Globe, which reported Chief Betro's remarks on January 22, 1999, stated, "[i]n the highly complex world of DNA testing, the idea that the results could be manipulated by juice is not reasonable, according to several scientists at laboratories who conduct the tests." The Globe

---

[36]The Daily Transcript article written by the reporter who attended the meeting is not part of the record.

article went on to state that "[t]he deputy laboratory director for Cellmark Diagnostics in Maryland, perhaps the best known private DNA testing laboratory in the country, dismissed the possibility."

Chief Betro argues that his statements at the meeting of concerned citizens are absolutely privileged and cannot form the basis for a defamation suit because they were made during the course of a criminal investigation. While "statements made to police or prosecutors prior to trial are absolutely privileged if they are made in the context of a proposed judicial proceeding," Correllas v. Viveiros, 572 N.E.2d 7, 11 (Mass. 1991), Chief Betro's statements were made to members of a neighborhood association and were unrelated to any "proposed judicial proceeding," id. The Massachusetts Supreme Judicial Court ("SJC") "has recognized the existence of an absolute privilege in relatively few circumstances." Mulgrew v. Taunton, 574 N.E.2d 389, 392 n.6 (Mass. 1991). Nevertheless, the court has recognized that "[s]tatements made by public officials while performing their official duties are conditionally privileged." Id. at 392. Chief Betro seeks recognition of that privilege as well. Under Massachusetts law, the availability of such a qualified privilege turns on whether Chief Betro had an official duty to discuss Burke at a meeting of concerned citizens.

The Massachusetts SJC has not decided the question of whether a police chief has an official duty to appear at a meeting

-58-

of citizens who are concerned about a violent crime but who are themselves uninvolved in the criminal investigation. While the court has extended a conditional privilege to statements made by a police chief to a city council committee about a police officer's performance history because "[t]he public has an interest in having a police force comprised of competent and able individuals," id. at 392, it has declined to extend a conditional privilege to statements made by a police chief to a newspaper reporter about a police officer's potentially illegal conduct where the statements were not made "during the original investigation" to "persons concerned with the investigation," Draghetti v. Chmielewski, 626 N.E.2d 862, 867-68 (Mass. 1994) (also rejecting argument that police chief "and the citizens who read the [newspaper] share a 'common interest' in the communication which entitles him to a qualified privilege"). "Lacking clear guidance" from the state courts, we must make our "best guess based on suggestive [Massachusetts] precedents, policy, and the general direction in which the case law is tending in other states." Nicolo v. Philip Morris, Inc., 201 F.3d 29, 40 (1st Cir. 2000).

The conditional privilege for defamatory statements is "designed to allow public officials to speak freely on matters of public importance in the exercise of their official duties." Draghetti, 626 N.E.2d at 867. Determining whether a conditional privilege is appropriate requires balancing of "the interest of the

-59-

defamed person in the protection of his reputation against the interests of the publisher, of third persons[,] and of the public in having the publication take place."  Restatement (Second) of Torts § 598A (1977).  Burke's interest in the protection of his reputation from false imputations of criminality cannot be gainsaid.  "Words may be found to be defamatory if they hold the plaintiff up to contempt, hatred, scorn or ridicule, or tend to impair his standing in the community."  Poland v. Post Publ. Co., 116 N.E.2d 860, 861 (Mass. 1953).  Imputations of criminality generally fit the bill.  See, e.g., Draghetti, 626 N.E.2d at 866; Jones v. Taibbi, 512 N.E.2d 260, 268-69 (Mass. 1987).

Nevertheless, the concerned citizens in this case were justifiably apprehensive about the commission of this brutal crime in their community and its implications for their safety.  Chief Betro accepted the invitation to speak at the meeting and attended in his official capacity.  Understandably, the local citizens looked to him for a current report on the status of the investigation. We note that several jurisdictions have recognized, either by statute or by judicial decision, a conditional privilege for statements made by the police to members of the press or the public.  See, e.g., Lanier v. Higgins, 623 S.W.2d 914, 916 (Ky. App. 1981) (police chief interviewed by television station "was not clothed with an absolute privilege but rather with a special or conditional privilege"); Trentecosta v. Beck, 703 So. 2d 552, 564

(La. 1997) (qualified privilege for "fair reporting of investigations or arrest" may be "available to . . . troopers in their role as law enforcement officers reporting the facts of an investigation and a resulting arrest to the press and, in turn, to the public"); Peterson v. City of Mitchell, 499 N.W.2d 911, 915-16 (S.D. 1993) (per curiam) (upholding application of statutory qualified "common interest privilege" for statements made in a police press release where "the citizens of Mitchell had [a] common, public interest in the apprehension of those responsible for [a] recent wave of thefts and vandalisms"). On balance, while recognizing that the authoritative call on this conditional privilege issue is for the Massachusetts SJC, our best judgment is that, when the SJC eventually decides the question, it will hold that Massachusetts law affords a police chief standing in Chief Betro's shoes the protection of a conditional privilege for allegedly defamatory statements to a citizens' group.

Unlike absolutely privileged statements, which "cannot support a claim of defamation, even if uttered with malice or in bad faith," Correllas, 572 N.E.2d at 10, a conditional privilege may be overcome where a plaintiff shows that the defendant "acted with actual malice or [that] there is unnecessary, unreasonable or excessive publication, and the plaintiff establishes that the defendant published the defamatory information recklessly," Mulgrew, 574 N.E.2d at 391 (internal quotation marks and citations

-61-

omitted).  While a reasonable jury could find that Chief Betro's alleged statements indicating that the police had "the right man" and theorizing that Burke could have rinsed his DNA out of his mouth before making the bite mark on the victim were "unnecessary, unreasonable or excessive," id. at 391,[37] the record reveals no evidence that Chief Betro acted with the necessary recklessness or actual malice to overcome the conditional privilege.  Accordingly, Chief Betro is entitled to summary judgment on Burke's defamation claim.

## VI. CONCLUSION

For the reasons stated, we **vacate** the district court's grant of summary judgment to Trooper McDonald on Burke's § 1983 claim alleging a Fourth Amendment violation.  In all other respects, the judgment of the district court is **affirmed**.  The parties shall bear their own costs.

---

[37]By contrast, Lt. Stillman, the Walpole Police Department's designated public information officer, limited his public statements to the disclosure of information supported by evidence. For example, The Walpole Times reported on January 21, 1999 that "Stillman acknowledg[ed] that DNA evidence and a palm print taken from the victim's body [have] excluded Burke.  Stillman did point out, however, that bite marks taken from Mrs. Kennedy's body matched Burke's dental profile, according to one of the nation's top forensic dentists."