# United States Court of Appeals
## For the First Circuit

No. 18-1914

UNITED STATES OF AMERICA,

Appellant,

v.

JAMIL ROMAN,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark G. Mastroianni, U.S. District Judge]

Before

Lynch, Stahl, and Lipez,
Circuit Judges.

Randall E. Kromm, Assistant United States Attorney, with whom Andrew E. Lelling, United States Attorney, was on brief, for appellant.

Ashley P. Allen, with whom Patricia A. DeJuneas was on brief, for appellee.

November 5, 2019

**STAHL**, **Circuit Judge**. This appeal arises out of an order suppressing evidence obtained from a search of Defendant-Appellee Jamil Roman's residence. The district court found that the warrant affidavit, reformed after a Franks hearing, did not establish probable cause to search either Roman's business or his home. Here, the government appeals the district court's order with respect to the search of Roman's residence only, contending the court erred in its probable cause determination. After careful review, we affirm.

## I. Factual Background

We recite the facts "as the trial court found them, consistent with record support." United States v. Andrade, 551 F.3d 103, 106 (1st Cir. 2008) (citation omitted).

### A. The Confidential Informant

In January 2014, federal agents seized three kilograms of cocaine from an individual known as "Confidential Human Source 1" ("CS"), who was under surveillance for suspected involvement in narcotics trafficking. CS subsequently agreed to cooperate with law enforcement as a confidential informant. At the local FBI office, CS provided a statement about his involvement in the narcotics operation to federal agents and law enforcement officers, including DEA Task Force member Robert Alberti, who transcribed CS's statement. CS stated that the cocaine agents had seized "came from Javier Gonzalez" and that Gonzalez had "had

[Roman] drop the kilos off" at CS's business at 712 Boston Road in Springfield, Massachusetts. CS initialed the written statement paragraph by paragraph and confirmed its accuracy.

Approximately a week after CS's statement was taken, DEA Special Agent Scott Smith joined the investigation. Smith, who was not present when CS's statement was taken, was not informed of the existence of the statement, nor did any DEA reports on the record reference it.

### B. The Affidavit

After approximately two months of surveilling the Gonzalez organization, Smith drafted an affidavit supporting search warrant applications for seven locations purportedly connected to the enterprise.[1] These included Roman's Holyoke, Massachusetts, business, TWC, as well as a residence located in Chicopee, Massachusetts, which agents believed to be Roman's home. A single affidavit was used to support all seven warrant applications.

---

[1] While the opinion below states that the affidavit supported applications to search six locations, in the affidavit the government sought to search seven locations: (1) JGL Truck Sales ("JGL"), owned by Gonzalez; (2) 654, 656, and 658 South Summer Street in Holyoke, Massachusetts, a series of parcels owned by Gonzalez which together compromised a parking lot across the street from JGL; (3) Cano Used Tire, a business adjacent to JGL; (4) Gonzalez's residence; (5) TWC Auto Body ("TWC"), owned by Roman; (6) a property believed to be Roman's residence in Chicopee, Massachusetts; and (7) the residence of another suspected participant.

The affidavit set forth the following information that between January and March 2014, the DEA had conducted an investigation that included in its scope a series of meetings between CS, Gonzalez, and, on occasion, Roman, some of which were recorded. At a January meeting between Gonzalez, Roman, and CS, held the day after CS told Gonzalez that the cocaine agents seized had been stolen, Gonzalez and Roman discussed the "robbery" of the drugs. During this meeting, as CS reported to law enforcement, Roman showed CS a firearm when discussing CS's safety during drug transactions. At a March meeting between CS and Roman, Roman discussed with CS the quality of the "traps" in certain vehicles and stated the "trapped vehicles" were in the garage of Cano Used Tire.[2] Roman also stated at this meeting that he suspected law enforcement was nearby and he would "shut down for a while and cool off" if he thought he was being surveilled. Three days later, at another meeting with Gonzalez, CS, and Roman, Roman stated they were "'dry'," which Agent Smith explained meant "they [did] not currently have a supply of drug[s]." According to the affidavit, Gonzalez told CS during the same conversation that CS needed to "repay his drug debt" and "should bring the money to either him

_____

[2] According to the affidavit, "traps" are hidden compartments designed to conceal drugs and drug proceeds in vehicles. The investigation focused on the organization's transportation of drugs from Texas to Massachusetts in vehicles outfitted with those compartments.

(Gonzalez) or Roman as soon as possible." The affidavit also differed from CS's transcribed statement in that it alleged the drug transaction between Roman and CS had taken place at Roman's Holyoke business rather than at CS's business in Springfield.

The affidavit alleged further that Gonzalez had transported fifty to sixty kilograms of cocaine from Texas to Massachusetts "approximately every three months over the past 7-8 years" and had on recent trips "been obtaining approximately 20 kilograms of heroin." It stated that CS had identified Roman as a "close criminal associate of Gonzalez" who "overs[aw] distribution of the narcotics for" him, as well as that CS had "relayed that . . . he would obtain kilogram quantities of cocaine" at TWC. The affidavit also alleged that Roman was "a known cocaine trafficker," though it did not identify the source of this information. Smith stated further in the affidavit that, based on his training and experience, drug traffickers commonly store drugs or drug-related inventory, proceeds, and records at their residences.

In the affidavit, the government identified three reasons it had probable cause to search the Chicopee property: (1) law enforcement believed it was Roman's primary residence; (2) Roman had initiated a utility service at this address in October 2013; and (3) "[o]n numerous occasions . . . , agents ha[d] observed Roman driving a blue colored Acura SUV," which was

"registered to Tanya Roman, believed to be [Roman's] wife," and which had been "seen at th[e] residence as recently as on March 16, 2014."  The affidavit also sought to establish probable cause to search Cano Used Tire, stating that agents had seen Roman "park his vehicle on the side walk of Cano Used Tire and carry a weighted bag into the business," then drive his vehicle into the garage and leave "a few minutes later."

Based on the warrant affidavit, on March 21, 2014, the magistrate judge authorized the warrants, which were executed four days later on TWC and the Chicopee residence.  Roman was arrested at TWC and his person was searched incident to the arrest.

## II.  Procedural Background

### A.    The Franks Hearing

On March 24, 2016, a grand jury indicted Roman on one count of conspiracy to distribute and possess with intent to distribute cocaine and heroin in violation of 21 U.S.C. § 846 and one count of distribution and possession with intent to distribute cocaine in violation of 21 U.S.C. § 841.  On May 10, 2017, Roman moved to suppress the fruits of the searches of TWC, his person, and his residence.  See United States v. Roman, No. 16-30020-MGM-2, 2017 WL 4517963, at *1 (D. Mass. Oct. 10, 2017) ("Roman I").  Roman also requested a hearing under Franks v. Delaware, 438 U.S. 154, 155-56 (1978), on the grounds that the government intentionally or recklessly misrepresented the location of the

- 6 -

drug transaction in the affidavit as being at TWC when it had in fact taken place at CS's Springfield business, as set forth in CS's written statement. Roman I, 2017 WL 4517963, at *2. The court granted a Franks hearing as to the alleged misrepresentations. Id. at *3-4.

Following the Franks hearing, the district court granted Roman's motion to suppress fruits obtained from the search of TWC. See United States v. Roman, 311 F. Supp. 3d 427, 441 (D. Mass. 2018) ("Roman II"). The court found that the affidavit contained material misrepresentations and omissions made with reckless disregard for the truth and without which a finding of probable cause would not have been made. Id. Specifically, the court found that CS's statement that he had received the drugs at his Springfield business—not at TWC—was accurate and, further, that the statement in the affidavit that CS "would obtain kilogram quantities of cocaine" at TWC was false.[3] Id. at 435-36. The court also found that the statement in the affidavit that Roman was "a known cocaine trafficker" was "conclusory" and lacked evidentiary support. Id. at 440-41.

Regarding recklessness, the district court found that a series of "easily preventable errors" demonstrated agents had

---

[3] The court also concluded that the affidavit involved an omission, which was "the failure to divulge CS's . . . written statement." Id. at 436.

acted with reckless disregard for the truth.  Id. at 437.  These included in particular the failure of officials to retain, place in the case file, or inform Agent Smith of the existence or content of CS's written statement, or to reference it in DEA reports.[4]  Id.  The district court focused on the testimony of Smith, Alberti, and another agent, John McGrath, and had the opportunity to evaluate their credibility.  Id. at 432.  When questioned about the source of the statement that CS would obtain kilogram quantities of cocaine from TWC, Smith could not identify the source of the information, but thought it came from CS, McGrath, or Alberti, while McGrath and Alberti gave "inconsistent testimony" regarding its source.  Id.  As such, the court found that Smith's affidavit misstated his own personal knowledge.  Id.

The court also found that several "less egregious errors," while "not determinative, support[ed] an inference" of reckless disregard for the truth.  Id. at 437.  These included a finding that Smith had "falsely quoted [Roman] as using the word 'dry'" in one recorded meeting, when Roman had actually stated "[t]here is nothing around brother, nothing."  Id. at 433, 437.

---

[4] The district court also found that CS's written statement had been taken in a "chaotic atmosphere."  Id. at 430.  It found that Alberti had "struggled at times keeping up with CS's responses because of significant disorganization in the multi-agent questioning process" conducted by both FBI and DEA agents, who "asked questions [to CS] rapidly and seemingly in random fashion" during the interview.  Id.

These also included agents' failure to notice and follow up on an FBI report in the case file referencing CS's written statement. Id. at 437.

Accordingly, the district court removed statements that CS "would obtain kilogram quantities of cocaine" at TWC and that Roman was "a known cocaine trafficker" from the reformed affidavit "for lack of evidentiary support." United States v. Roman, 327 F. Supp. 3d 312, 325 (D. Mass. 2018) ("Roman III"). It also reformed the affidavit by altering statements indicating the drug transaction occurred at TWC to properly state it instead took place at CS's business address. See id. It found that the reformed affidavit failed to establish probable cause to search TWC. Roman II, 311 F. Supp. 3d at 439-41.

## B. The Fruits of the Residential Search

The district court also found that the reformed affidavit did not support a finding of probable cause to search Roman's residence. See Roman III, 327 F. Supp. 3d at 325-28. Specifically, the court held that the reformed affidavit's allegations "d[id] not create a sufficient link between the criminal activity and" the home. Id. at 325 (citation omitted). The court concluded that the government had not sufficiently set forth facts showing Roman had a "long-time" history of drug dealing to permit the inference Roman would keep drug-related evidence in his residence. Id. at 326. It observed that, unlike other cases

from this Court identifying such a nexus, there was no evidence in the affidavit as to the length of time Roman was engaged in drug trafficking, facts that directly connected the residence with drug activity, or any evidence Roman had left or returned to that location in connection with drug transactions.[5]  Id.  Moreover, the court noted that the affidavit alleged that "the vehicles, used to conceal the cash and drugs, were stored near Gonzalez's business" and that Gonzalez "clearly occupied the main focus of the affidavit."  Id. at 327 (citation omitted).  As such, it found that "any inference that could permissibly be drawn from [Roman's] status as a drug dealer regarding the location of evidence is significantly weakened where . . . it is more likely that such evidence would be found at the residence or business of another individual"—Gonzalez.  Id. (citation omitted).

Accordingly, the district court suppressed the fruits of the search of Roman's residence, that is, $438,560 in cash, a firearm, and photographic identification documents.  Id. at 328. It is from this ruling that this timely appeal followed.

---

[5] The court also found "the force and weight of [Smith's] assertion" that it was common for drug traffickers to store inventory, paraphernalia and records at the home to be "significantly compromised" given the findings in the Franks hearing.  Id. at 327.

- 10 -

**III. Analysis**

In reviewing a ruling on a motion to suppress, this court "accepts the district court's factual findings to the extent that they are not clearly erroneous, and review[s] its legal conclusions de novo." United States v. Davis, 909 F.3d 9, 16 (1st Cir. 2018) (alteration in original) (internal quotation marks and citation omitted). We afford "due weight to inferences drawn from [historical facts]" by lower courts. United States v. Dapolito, 713 F.3d 141, 147 (1st Cir. 2013) (alteration in original) (quoting Ornelas v. United States, 517 U.S. 690, 699 (1996)). In applying this standard, "we take the record evidence in the light most favorable to the suppression ruling." United States v. Arnott, 758 F.3d 40, 43 (1st Cir. 2014). We may affirm "on any basis apparent in the record." Id.

The government argues on appeal that the district court erred in ruling that the reformed affidavit did not establish probable cause to search Roman's residence. We find no such error for the reasons below.

The "very core" of the Fourth Amendment is to be "free from unreasonable governmental intrusion" into one's home. Florida v. Jardines, 569 U.S. 1, 6 (2013) (quoting Silverman v. United States, 365 U.S. 505, 511 (1961)). Indeed, the home is "first among equals" in Fourth Amendment protection. Jardines, 569 U.S. at 6; see also Morse v. Cloutier, 869 F.3d 16, 23 (1st

- 11 -

Cir. 2017) (the home "is shielded by the highest level of Fourth Amendment protection") (internal quotation marks omitted). These bedrock principles guide our analysis and disposition.

An application for a warrant "must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element." United States v. Dixon, 787 F.3d 55, 59 (1st Cir. 2015) (quoting United States v. Feliz, 182 F.3d 82, 86 (1st Cir. 1999)). A magistrate judge considering the "nexus" element must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him," there exists a "fair probability" evidence will be found in the place to be searched. Feliz, 182 F.3d at 86 (quoting Illinois v. Gates, 462 U.S. 213, 238 (1983)). And, while reviewing courts generally afford substantial deference to a magistrate's determination of probable cause, where "[a]llegations of intentional or reckless misstatements or omissions" are proven true, we owe "no deference to a magistrate's decision" because this "implicate[s] the very truthfulness, not just the sufficiency, of a warrant application." Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005).

The government claims it had probable cause to search Roman's residence on two grounds. First, it argues that the reformed affidavit contained direct evidence establishing a nexus

- 12 -

between drug activity and the home. It also contends that absent direct evidence, the reformed affidavit set forth facts permitting the inference that drug-related evidence would be found at the residence. We address these assertions in turn.

As to the government's first contention, we find that the reformed affidavit contained insufficient evidence to directly tie drug activity to Roman's residence. The affidavit is devoid of information from CS or any other source connecting drug activity to the home. CS did not state or indicate that he believed Roman conducted drug-related business from or kept drug-related evidence at the home, that any of the "trapped" vehicles could be found at or had traveled to the home, that any meetings of the conspiracy or drug deals had taken place there, or that Gonzalez had been observed at the residence. Rather, the government's case depends entirely on inferences in the affidavit made by Smith, drawn largely from stricken material.

The government offers a single statement from the reformed affidavit in support of its argument there existed direct evidence: that agents observed Roman parking his vehicle outside of and carrying a "weighted bag" into Cano Used Tire. It contends this "supports the drawing of at least an inferential link between Roman's car . . . and his criminal activities," which extends to Roman's home because the car was "registered to his wife at their shared residence."

We do not agree. The nexus element requires a showing that "enumerated evidence of the offense will be found at the place searched." Dixon, 787 F.3d at 59 (emphasis added). The inquiry is not whether "the owner of the property is suspected of crime" but rather whether "there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought." Zurcher v. Stanford Daily, 436 U.S. 547, 556 (1978) (internal quotation marks omitted). Tested against this standard, the government's argument fails.

First, the affidavit does not establish that the vehicle Roman parked at Cano Used Tire is the same "blue colored Acura SUV" that agents on separate occasions observed Roman driving and saw parked at the residence. It also does not suggest that the "weighted bag" contained drugs or drug-related evidence. Nor does it allege that Roman had driven the car to or from his residence on the day he carried the weighted bag, a factor we have previously found supports an inference of nexus. See Dixon, 787 F.3d at 60; United States v. Barnes, 492 F.3d 33, 37-38 (1st Cir. 2007); United States v. Ribeiro, 397 F.3d 43, 49-50 (1st Cir. 2005).

The government argues that "at a minimum," surveillance of Roman carrying the weighted bag from a car into Cano Used Tire "provides some additional support for the proposition that activities associated with the operation occurred at multiple locations and involved the use of a vehicle." Even if true, these

- 14 -

additional facts do not sufficiently link Roman's suspected crimes to his home—"the place searched"—such that there was probable cause to search the residence. Dixon, 787 F.3d at 59. A proper reading of the reformed affidavit is that agents observed Roman carrying a weighted bag, contents unknown, into Cano Used Tire from "his vehicle," which may or may not be the same vehicle seen at Roman's residence. We see no basis to conclude on these facts that drug-related evidence would be present at Roman's home.

The government argues next that absent direct evidence, the reformed affidavit "provided ample reason" to infer relevant evidence would be found in Roman's home. We disagree.

A "nexus . . . need not, and often will not, rest on direct observation, but rather 'can be inferred from the type of crime, the nature of the items sought, the extent of an opportunity for concealment and normal inferences as to where a criminal would hide [evidence of a crime].'" Feliz, 182 F.3d at 88 (alteration in original) (quoting United States v. Charest, 602 F.2d 1015, 1017 (1st Cir. 1979)). This follows from the well-settled principle that "a probable cause determination is fundamentally a fact-specific inquiry" where "[n]o one factor possesses talismanic powers." United States v. Khounsavanh, 113 F.3d 279, 285 (1st Cir. 1997).

But we have not permitted this inference to be applied lightly. We have made clear that we "do not suggest that, in all

- 15 -

criminal cases, there will automatically be probable cause to search a suspect's residence." Feliz, 182 F.3d at 88. As such, we have rejected a per se rule automatically permitting the search of a defendant's home when he has engaged in drug activity. Khounsavanh, 113 F.3d at 285. We have further "expressed skepticism that probable cause can be established by the combination of the fact that a defendant sells drugs and general information from police officers that drug dealers tend to store evidence in their homes." United States v. Bain, 874 F.3d 1, 23-24 (1st Cir. 2017) (citation omitted), cert. denied, 138 S. Ct. 1593 (2018). Accordingly, we have found that "generalized observations" of this type should be "combined with specific observations," or facts "connecting the drug dealing to the home" to permit an inference of nexus to a defendant's residence. Ribeiro, 397 F.3d at 50-51; Bain, 874 F.3d at 24. Examples of such "specific observations" include evidence that drug distribution "was being organized from [the defendant's] residence," United States v. Keene, 341 F.3d 78, 82 (1st Cir. 2003), that the defendant used his home as a communications hub for drug activity, United States v. Rivera, 825 F.3d 59, 64-65 (1st Cir. 2016), or that the defendant "move[d] back and forth from his residence in relation to drug transactions," Ribeiro, 397 F.3d at 51.

- 16 -

The government argues that, when "[t]aken together," facts drawn from the reformed affidavit permit the inference that Roman "would have a need to keep drugs, proceeds, and records" at his residence. We find that they do not. Here, the reformed affidavit, unlike the affidavits in the cases above and cited by the government, contains no specific facts or observations connecting Roman's alleged drug activity to his home. Indeed, it fails to even on one occasion place Roman himself at the residence, let alone in connection with drug crimes.

We have, however, in narrow circumstances inferred a nexus to a defendant's residence absent such specific facts. In Feliz, we permitted this inference where the affidavit established the defendant was "a long-time, successful, drug trafficker," identified "[n]o other residence or drug-dealing headquarters," and contained a statement from a law enforcement affiant that drug traffickers commonly keep drug-related evidence at their homes. 182 F.3d at 87-88. Accordingly, we found that it was not "unreasonable" for the issuing magistrate to have "relied upon . . . common sense, buttressed by affiant's opinion as a law enforcement officer," to infer a nexus between drug activity and the defendant's residence. Id. at 88.

The government argues that the reformed affidavit permits the inference of a nexus to Roman's residence under our holding in Feliz. Again, we find that it does not.

We agree with the district court that the facts here are "a far cry" from the facts in Feliz. Roman III, 327 F. Supp. 3d at 326 (citation omitted). As an initial matter, the Feliz affidavit did not contain any recklessly made material misrepresentations or present any questions of credibility as to the affiant. Accordingly, the Feliz court afforded "considerable deference" to the magistrate judge's probable cause determination. 182 F.3d at 86 (internal quotation marks omitted). Further, the affidavit there included information from two reliable confidential informants who averred that the defendant trafficked drugs, including direct testimony from one informant that the defendant was a "long-time, successful, drug trafficker" from whom the informant had purchased drugs on several prior occasions, dating back approximately twelve years. Id. at 86-87. The court found there that "[i]n sum, the affidavit contained substantial, detailed information indicating that [the defendant] had engaged in illegal drug trafficking for at least twelve years," supporting the conclusion that "Feliz's drug trafficking was of a continuous and ongoing nature." Id. at 87. The affidavit also identified "[n]o other residence or drug-dealing headquarters of [the defendant's]," supporting the inference that a "likely place to seek to find incriminating items" would be his home. Id. at 88.

The reformed affidavit here establishes no such record. It offers no evidence pertaining to the length of Roman's

involvement with drug trafficking in general or the Gonzalez organization in particular. See id. at 87. Nor does it suggest that Roman had any prior drug-related criminal convictions or that any drug activity had been conducted from the residence. Cf. United States v. Hicks, 575 F.3d 130, 137 (1st Cir. 2009) (holding that "the circumstances set forth in the affidavit—which included . . . appellant's prior convictions and his connections to known drug dealers who operated out of [the residence]" established probable cause). Further, unlike the affidavit in Feliz, which offered testimony from two experienced informants, the reformed affidavit here relies on the testimony of only one informant, CS, whose credibility as a source was not established. The affidavit also does not offer corroboration through law enforcement surveillance, other informants, or any other source, of CS's statement that Roman was a "close criminal associate" of Gonzalez's or "overs[aw] the narcotics" operation. See Keene, 341 F.3d at 81-82 ("Factors to be considered in determining whether a search warrant should issue include 'the value of corroboration of details of an informant's tips by independent police work.'" (quoting Gates, 462 U.S. at 241)).

Our conclusion is further bolstered by the fact that the reformed affidavit supported warrant applications for several other locations purportedly connected to the organization. As we asked in Feliz, "[i]f [the defendant] did not maintain his accounts

- 19 -

and records, and the presumably large sums of money received in the course of his dealings, at his apartment, where else would he keep them?" 182 F.3d at 88. We do not face that question here. The reformed affidavit supported searches of six other locations, including TWC and JGL, which the government itself characterizes as the "headquarters" of the organization.[6] It establishes that police believed that drug activity did take place at those locations, suggesting that vehicles the organization used to conceal drugs and drug proceeds would be found at or had traveled through JGL and Cano Used Tire; drug transactions had taken place at JGL and the residence of another suspect; and meetings between Gonzalez, CS, and, on occasion, Roman, had taken place at JGL and TWC.[7] We agree with the district court's conclusion that "any inference that could permissibly be drawn from [Roman's] status as a drug dealer regarding the location of evidence is significantly weakened where, as here, it is more likely that such evidence would be found at the residence or business of another individual"—

---

[6] The government argues that Roman would have kept drug-related evidence at his home because TWC was "frequented by employees and/or customers and [the home] would thus be more likely to keep contraband away from prying eyes." However, the fact that the government also sought a warrant to search TWC in connection with alleged drug activity lessens the force of this contention.

[7] We find the government's theory that Roman could not have returned proceeds to JGL when Gonzalez was out of town and, as such, would "logical[ly]" have stored items at his home, to be speculative and without factual basis.

Gonzalez.  Roman II, 311 F. Supp. 3d at 440 (citing Feliz, 182 F.3d at 88).

Moreover, as the affidavit here contained "reckless misstatements," unlike the affidavit in Feliz, we afford no deference to the magistrate judge's determination.  Burke, 405 F.3d at 82.  Accordingly, we cannot infer from the facts before us that Roman was a "long-time, successful, drug trafficker" with "continuous and ongoing" involvement sufficient to establish a nexus to his residence under Feliz.  182 F.3d at 87-88.  We hold so even if considered in tandem with Smith's statement that traffickers commonly store relevant evidence at their homes.[8]

Relatedly, the government contends that the "large-scale" nature of the conspiracy and Roman's allegedly central role in it prove Roman was an "experienced trafficker" sufficient to infer a nexus under Feliz.  We afford due weight to the factual inference made by the district court that the record is "simply not sufficient to substantiate the affidavit's assertions that . . . [Roman] was an established drug dealer."  Roman III, 327 F.

---

[8] The government contends in reply that the district court's findings as to Smith's credibility "do not preclude consideration of his statements."  We recognize that "[w]e have, with a regularity bordering on the echolalic, endorsed the concept that a law enforcement officer's training and experience may yield insights that support a probable cause determination."  United States v. Floyd, 740 F.3d 22, 35 (1st Cir. 2014).  However, we need not reach this issue, given our conclusion that there was not probable cause to search Roman's home even assuming we can consider the statements made by Smith based on his training and experience.

Supp. 3d at 324. Further, the government cites no basis in law for the proposition that a nexus to a defendant's residence may be inferred where the defendant plays a "central role" in a large-scale enterprise. As previously stated, we consider the totality of circumstances in making a probable cause determination. See Feliz, 182 F.3d at 88. Accordingly, we consider factors such as Roman's role and the size of the operation but find neither fact, alone or in combination, dispositive as to the issue of whether Roman was an established trafficker, nor sufficient to upset the district court's factual inference that there was insufficient evidence to support this conclusion.[9]

---

[9] We do wish to address the government's assertion that "[i]n its scale, Gonzalez's operation, and Roman's alleged role in it, far exceeds that [which] courts have found sufficient" to establish probable cause to search a defendant's residence. The cases the government cites are distinguishable on the facts. In Ribeiro, while we did consider the size and scope of the defendant's drug activity, we did not make our determination on this factor alone. See 397 F.3d at 50. The affidavit there contained specific facts connecting the defendant's drug activity to his residence, as "the police observed [him] on several occasions when it was virtually certain that he left his residence carrying the ecstasy tablets" he would later sell in a controlled buy. Id. at 50, 52. Similarly, in United States v. Hodge, 246 F.3d 301, 306-07 (3d Cir. 2001), the Third Circuit considered the amount of cocaine the defendant possessed as part of its finding of probable cause, but also noted that the affidavit suggested he was an "experienced and repeat drug dealer who would need to store evidence of his illicit activities somewhere." The court found further that the defendant's home was more likely to be that location in part because the defendant's residence was in the same city as an anticipated drug delivery and the defendant conceded that there was probable cause to arrest him on drug-related charges. Id.

- 22 -

Further, even if we were to accept the government's contention that the "large scale of the operation provide[s] strong grounds for concluding that relevant evidence might be kept at multiple locations," this does not relieve the government of its burden to provide specific evidence as to each "place [to be] searched."  Dixon, 787 F.3d at 59.  The government has not met this burden.

This is not a "case where the affidavit recite[s] facts establishing a clear and substantial connection between the illegal activity and the place searched"; rather, the government's argument relies upon "speculative inferences piled upon inferences" that Roman's residence would yield relevant evidence. United States v. Rodrigue, 560 F.3d 29, 33-34 (1st Cir. 2009). Accordingly, because the reformed affidavit fails to establish probable cause to search Roman's residence, the fruits of the search of the residence were properly suppressed.

**IV.  Conclusion**

For the foregoing reasons, the district court's grant of the motion to suppress evidence obtained from Roman's residence is AFFIRMED.