# United States Court of Appeals
## For the First Circuit

No. 23-1029

UNITED STATES,

Appellee,

v.

DAMIAN CORTEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Leo T. Sorokin, U.S. District Judge]

Before

Montecalvo, Lynch, and Rikelman,
Circuit Judges.

Sara E. Silva, with whom Silva Kettlewell & Pignatelli LLP
was on brief, for appellant.
Mark T. Quinlivan, Assistant United States Attorney, with
whom Joshua S. Levy, Acting United States Attorney, was on brief,
for appellee.

July 11, 2024

**LYNCH**, <u>Circuit Judge</u>.  Following the denial of his two motions to suppress evidence seized pursuant to two different search warrants, Damian Cortez conditionally pled guilty, first, to conspiracy to distribute and to possess with intent to distribute controlled substances, and second, to possession with intent to distribute four hundred grams or more of fentanyl.  The government was prepared to introduce evidence at trial that Cortez had participated in such a conspiracy as a member of a Massachusetts gang known as "NOB."

Cortez appeals from the district court's denial of his second motion to suppress evidence seized, pursuant to a warrant targeting a RICO conspiracy, from an apartment in which the government asserted Cortez was residing.  The court rejected Cortez's contention that the affidavit supporting the warrant application did not establish probable cause either that Cortez was an associate in a RICO conspiracy or that Cortez was residing in the apartment (especially in light of an earlier warrant affidavit asserting it was likely he lived elsewhere).  The court denied his request for a <u>Franks</u> hearing, which he also appeals. See <u>Franks</u> v. <u>Delaware</u>, 438 U.S. 154 (1978).  We affirm.

## I. Background

In May 2020, Detective Brian Ball of the Boston Police Department applied for a search warrant to search two cell phones believed to belong to Cortez.  In his supporting affidavit, Ball

said he had been "assigned to the Boston Police Youth Violence Strike Force (Gang Unit)," and he described a "multi-agency investigation into the criminal activities of a criminal organization known as the 'Wendover Street Gang' and a subset of the Wendover gang referred to as 'NOB.'" NOB/Wendover gang members and associated persons, including Cortez, were "being investigated for offenses involving, amongst others, racketeering conspiracy, . . . violent crimes in aid of racketeering, . . . possession of firearms in furtherance of crimes of violence, . . . and possession of firearms and ammunition by convicted felons . . . ." The affidavit stated:

> NOB/Wendover members and associates have been involved in numerous shootings and violent altercations throughout the greater Boston area with rival gangs . . . . NOB/Wendover members and associates have admitted to law enforcement and others that they obtain illegal drugs and firearms from within the state of Massachusetts and other states. During this time period, numerous NOB/Wendover members and associates have been arrested for various crimes, including homicide, possession with intent to distribute illegal drugs, illegal possession of firearms and ammunition, robbery, assault and others.

The affidavit further stated that, on April 28, 2020, detectives had observed a man, later identified as Cortez, driving a white 2020 Chevrolet Malibu while illegally using his cell phone. The detectives attempted to conduct a traffic stop, but the driver "sped away at a high rate of speed, with the detectives following,"

and then "struck a parked vehicle," at which point the driver "fled the accident on foot." Law enforcement, based on a search of the Massachusetts Registry of Motor Vehicles License photo database and the discovery in the vehicle of a prescription bottle with Cortez's name on the label, identified Cortez as the operator who had fled. The officers found two cell phones in the car. A bag of off-white powder found in "C[ortez]'s flight path as he ran from the crashed Malibu the previous day" was reported by a neighborhood resident. The bag "tested positive for [f]entanyl."

Detective Ball's May affidavit stated that there was probable cause to believe Cortez was a member/associate of NOB/Wendover and that the cell phones would contain "evidence, fruits and instrumentalities of the" offenses targeted by the warrant, and described the previous incidents and investigations which supported this conclusion. Among these, "[i]nvestigators ha[d] monitored a pole camera placed near C[ortez]'s home . . . in Randolph," and had observed Cortez engaging in "quick encounters and frequently entering[] and exiting [the Randolph location] for short time periods," behavior that Ball stated "is consistent with someone engaging in drug distribution." The search of the cell phones and further investigation produced more evidence implicating Cortez. The warrant was issued by a Magistrate Judge on May 6, 2020.

- 4 -

In June 2020, Detective Ball sought a separate warrant to search an apartment in Attleboro, Massachusetts, where investigators had cause to believe Cortez was residing at the time. The application listed as the target offense of the search "RICO conspiracy," 18 U.S.C. § 1962(d). Ball's supporting affidavit repeated much of the information that was included in the May affidavit about the multi-agency investigation into NOB, and added that there was probable cause to believe that the Attleboro apartment "contains evidence, fruits, and instrumentalities of" Cortez's involvement in a RICO conspiracy with other NOB members/associates.

To support the assertion that Cortez was involved in a RICO conspiracy, the affidavit stated that, "[p]er the ongoing investigation, Cortez has been identified as working with NOB members/associates to commit crimes, including drug trafficking, sex trafficking, and arson." Ball described Cortez's arrest and charges in Maine with other NOB member/associates for sex trafficking, that "one of the sources of [drug] supply utilized by NOB members/associates . . . is . . . Cortez's brother," and that in February 2020,

> Cortez and other NOB members/associates were observed in a black Honda Fit vehicle that has been associated with a[n] NOB-related murder . . . . [which] occurred on February 8, 2020[,] in Brockton, MA. The suspects in the murder were captured on surveillance video travelling in tandem to the crime scene and leaving the

- 5 -

area of the crime scene in two vehicles, [one of which was] the black Honda Fit. The black Honda Fit was also observed parked at the home of Cortez's parents . . . in Randolph, MA, on February 25, 2020. Based on [his] training and experience, [Ball] believe[d] the vehicle was being kept at the Randolph location to avoid detection by law enforcement.

As further support, the affidavit stated that there was "probable cause to believe that Cortez [had] committed a gang-related arson in furtherance of NOB's criminal activities on or about February 25, 2020, in Abington, MA. Based on a review of video footage recovered by investigators, Cortez set fire to a silver Honda Accord," a vehicle that "had been stolen by NOB members/associates" earlier in the month, and whose theft had also involved the kidnapping of a five-year-old child. Ball stated that, "[b]ased on [his] training and experience, [he] believe[d] that Cortez destroyed the vehicle to hinder law enforcement efforts to recover forensic evidence from the vehicle which could be used to connect NOB members/associates to the carjacking/kidnapping."

Detective Ball additionally provided, as evidence of Cortez's involvement in a RICO conspiracy, information that had been gathered from the search of the two cell phones which had been authorized by the Magistrate Judge in May. Investigators had observed that

> [m]any of Cortez's text messages were sent to drug suppliers, in efforts to obtain narcotics, and to buyers, in efforts to re-distribute narcotics. Many of these

messages contained efforts to pay and collect drug debts from various individuals. In messages in mid-March 2020, Cortez communicated with NOB member Anthony Depina about obtaining marijuana. In addition, investigators also have identified numerous communications between Cortez and NOB member Moses Cabral. Included were communications between . . . Cortez and Cabral, dated April 28, 2020, which support that, prior to being involved in the [April 28] hit and run, . . . Cortez had met with Cabral and "re-upped," acquiring from Cabral the fentanyl found abandoned in the driveway along Cortez's flight path the following day.

As to the nexus to the Attleboro apartment sought to be searched, the affidavit stated that, based on law enforcement's continuing investigation of Cortez, "there is probable cause to believe that [he] is residing at the [Attleboro apartment], which is a location associated with Anthony Depina, an NOB member/associate, who is one of Cortez's close associates. Based on the investigation, Depina allows Cortez to stay at the [Attleboro apartment] . . . ."

To support that Cortez was "residing" then at the Attleboro apartment, Detective Ball stated that "GPS data for the phone which Cortez used for drug-related communications showed that the phone was regularly located at the [Attleboro apartment]." Indeed, that phone included photographs which the phone's metadata established "were taken from inside the [apartment] and showed the interior of the apartment," and the photographs revealed that "Cortez [was] resid[ing] on the top" apartment of the building,

- 7 -

the apartment which was the target of the requested search. The affidavit stated:

> Investigators conducting surveillance of the [apartment] have observed Cortez there on numerous occasions over an extended period of time. Cortez has frequently been observed entering and exiting [the building], usually through the rear door. Cortez was observed at [the building] within the last two weeks. Cortez's vehicle, a white Chrysler sedan, has been observed parked at the [building] over an extended period of time. The most recent observation of the vehicle occurred within the last week.

As evidence that Depina was not residing at the apartment and that he was allowing Cortez "to stay" at the apartment, the affidavit stated that

> Depina primarily resides at a residence in Providence, RI, with his child and the child's mother. Investigators have confirmed in a recent encounter with Depina that he is residing in Rhode Island. Depina lists the [Attleboro apartment] as his mailing address with the Massachusetts Registry of Motor Vehicles and on credit reports.

Further, "[t]here is a mailbox affixed next to the right door [of the building] labeled '3 Depina.'"

To support that there was probable cause to believe that the Attleboro apartment would contain evidence of the target offense, Ball's affidavit stated that,

> [b]ased on [his] training and experience, [he] know[s] that individuals typically possess in their residences documents and other items that reflect their occupancy and control of the premises, . . . . that members and

- 8 -

associates of violent street gangs, such as NOB, maintain various types of gang-related materials at their residence as part of their membership in or association with the gang, . . . . [and] that members and associates of violent street gangs, like NOB, will maintain weapons at their residence . . . .

The same Magistrate Judge issued the June 2020 warrant.

On June 16, 2020, law enforcement officers executed the warrant and seized many items from the apartment, including several hundred blue pills containing fentanyl packaged for distribution; "a significant amount of powder fentanyl"; "a commercial pill press"; "various dies to stamp pills associate[d] with the commercial pill press"; "various types of cutting agents"; and "a package for the shipment of materials related to the commercial pill press, which had been shipped and addressed to [Cortez]." The government alleged that "the type of blue fentanyl pills seized from the apartment w[as] consistent with [the] pills distributed by various members and associates of . . . NOB." Investigators also recovered from the apartment a notebook containing "rap lyrics in which [Cortez] admitted to dealing drugs and his association with the NOB street gang." This appeal concerns the district court's denial of suppression of that evidence.

## II. Procedural History

In September 2020, a grand jury charged Cortez with possession with intent to distribute four hundred grams or more of

- 9 -

fentanyl, in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(A)(vi) and 18 U.S.C. § 2; and with committing a Mann Act violation under 18 U.S.C. § 2421. In March 2022, a superseding indictment was returned that, in relevant part, additionally charged Cortez with conspiracy to distribute and to possess with intent to distribute controlled substances, in violation of 21 U.S.C. § 846.

In February 2022, Cortez filed a motion to suppress evidence obtained from the June search of the Attleboro apartment, and separately, a motion to suppress evidence obtained from the May search of the two cell phones. In each of these motions, Cortez sought a hearing pursuant to Franks v. Delaware, 438 U.S. 154 (1978), asserting that the affidavits supporting the warrant applications were tainted by false statements and omissions.

Unusually, trial counsel for Cortez submitted his own affidavit, which stated:

> I have reviewed the discovery provided in this case, including the footage of a surveillance video of a car fire occurring in Abington on February 25, 2020. On the basis of my review, I am unable to identify the person setting fire to the vehicle. I have requested from the AUSA information concerning the basis of the identification in the Affidavit, and have been informed that the Defendant was identified from the clothing he was wearing.

The affidavit also stated:

> I have reviewed the text messages of Defendant's cell phone provided to me in discovery and have not been able to locate in said messages any communications between Moses

- 10 -

Cabral and Defendant on April 28, 2020, that would form the basis of a conclusion that Defendant had "re-upped" for fentanyl on April 28, 2020. I have requested of the AUSA that he/she provide me with any such messages but as of this date no such messages have been provided.

In May 2022, the district court, in an order on the motions to suppress, denied Cortez's motions and found that no Franks hearing or further argument was warranted. In June 2022, Cortez pled guilty to conspiracy to distribute and to possess with intent to distribute controlled substances, and to possession with intent to distribute fentanyl. The government dismissed the Mann Act count of the superseding indictment. Cortez's plea agreement reserved his right to appeal the denial of his motions to suppress evidence.

Cortez's appeal is restricted to attacking the denial of the motion to suppress the search of the Attleboro apartment authorized by the June warrant, and the denial of the Franks hearing.

### III. Analysis

#### 1. Standard of Review

In reviewing a denial of a motion to suppress, this court reviews de novo a district court's application of the law to its findings of fact, including its determination of whether there was probable cause to support a search warrant. United States v. Corleto, 56 F.4th 169, 174-75 (1st Cir. 2022). We review

- 11 -

"questions of fact and credibility determinations . . . for clear error," United States v. Cowette, 88 F.4th 95, 100 (1st Cir. 2023), viewing "the facts in the light most favorable to the district court's ruling," id. (quoting United States v. Oquendo-Rivas, 750 F.3d 12, 16 (1st Cir. 2014)).  "So long as any reasonable view of the evidence supports it, we will uphold the denial of the motion to suppress."  Id. (internal quotation marks omitted) (quoting United States v. Molina-Gómez, 781 F.3d 13, 18 (1st Cir. 2015)).

Where, as here, the search was pursuant to a warrant issued by a magistrate judge, the defendant faces an even higher burden.  We "accord 'considerable deference to reasonable inferences the [issuing justice] may have drawn from the attested facts,'" United States v. Barnard, 299 F.3d 90, 93 (1st Cir. 2002) (alteration in original) (quoting United States v. Zayas-Diaz, 95 F.3d 105, 111 (1st Cir. 1996)), and "[i]n a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause," id.

In reviewing a denial of a request for a Franks hearing, we have stated in some cases that "we review the [d]istrict [c]ourt's factual determinations . . . for clear error, and its" legal determinations de novo.  United States v. Maglio, 21 F.4th 179, 186 (1st Cir. 2021) (quoting United States v. Veloz, 948 F.3d 418, 427-28 (1st Cir. 2020)).  But in other cases, we have explained more simply that "[w]e review the denial of a Franks

hearing for clear error." United States v. Austin, 991 F.3d 51, 57 (1st Cir. 2021). We need not dwell on the applicable standard of review here, however, because the parties do not dispute that clear error review applies to the district court's denial of Cortez's request for a Franks hearing.

## 2. Participation in a RICO Conspiracy

We agree with the district court that "the Magistrate Judge reasonably concluded that the June affidavit establishes probable cause to believe Cortez was a participant in a RICO conspiracy via his involvement with NOB."

"[T]he probable cause standard is not a high bar," United States v. Sheehan, 70 F.4th 36, 44 (1st Cir. 2023) (internal quotation marks omitted) (quoting United States v. Adams, 971 F.3d 22, 32 (1st Cir. 2020)), as it "requires only 'the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act,'" id. (alteration in original) (internal quotation marks omitted) (quoting Florida v. Harris, 568 U.S. 237, 244 (2013)). "In assessing whether a search warrant affidavit establishes probable cause, the court 'consider[s] . . . the "totality of the circumstances,"'" United States v. Sylvestre, 78 F.4th 28, 33 (1st Cir. 2023) (alteration and omission in original) (quoting United States v. Tiem Trinh, 665 F.3d 1, 10 (1st Cir. 2011)), based on "the 'facts and supported opinions set out within the four corners of the affidavit,'" Corleto, 56 F.4th at 175

- 13 -

(internal quotation marks omitted) (quoting <u>United States</u> v. <u>Lindsey</u>, 3 F.4th 32, 39 (1st Cir. 2021)). Under the Fourth Amendment, "[a]n application for a warrant 'must demonstrate probable cause to believe that (1) a crime has been committed -- the "commission" element, and (2) enumerated evidence of the offense will be found at the place searched -- the so-called "nexus" element.'" <u>United States</u> v. <u>Roman</u>, 942 F.3d 43, 50 (1st Cir. 2019) (quoting <u>United States</u> v. <u>Dixon</u>, 787 F.3d 55, 59 (1st Cir. 2015)).

The district court correctly reasoned that probable cause for Cortez's involvement in a RICO conspiracy was established in part by the June affidavit's

> descriptions of evidence suggesting: Cortez was residing at an apartment rented by an NOB member (instead of at his family's home in Randolph); Cortez was arrested with two other members of NOB for sex trafficking in 2017; his brother was believed to supply NOB's drug trafficking operation; and electronic communications showed Cortez discussed drug trafficking with at least two NOB members, including one of his 2017 sex-trafficking co-defendants. In addition, [Detective Ball] summarized the types of crimes he and other officers had linked to NOB during their two-year investigation . . . .

(Footnotes omitted.)

The June affidavit additionally described evidence that "Cortez ha[d] supported other NOB members/associates by concealing and destroying evidence of crimes, including murder and

- 14 -

kidnapping, committed by the group." This includes evidence that Cortez had acted to hide from law enforcement the Honda Fit associated with an NOB-related murder; and that Cortez had set fire to a Honda Accord, which had been stolen by NOB members/associates and had been involved in a kidnapping, in order to "hinder law enforcement efforts to recover forensic evidence from the vehicle." The June affidavit also described evidence that Cortez had been carrying a bag containing eighteen grams of fentanyl when he fled from law enforcement officers, and that this fentanyl had been acquired from an NOB member.

The district court did not err in its conclusion that, under the probable cause standard, "[n]o more [than this] was required." Cortez argues that the June affidavit did not sufficiently demonstrate that his actions satisfied each of the elements of a RICO conspiracy, but this argument misunderstands the probable cause standard.[1] See Jordan v. Town of Waldoboro,

[1] Cortez also argues that the government's decision not to indict him for a RICO conspiracy "strongly suggests" an absence of probable cause, but he does not cite any caselaw which supports this reasoning. Nor does the argument have merit. He additionally suggests that this court should find an absence of probable cause because "the warrant in this case issued at the tail end of a years-long investigation and mere weeks before the first indictment was returned." Cortez does not explain, however, why this timing should undermine the Magistrate Judge's probable cause determination, nor does Cortez cite any caselaw indicating that such a factor on its own should be treated as dispositive. Cf. United States v. Vigeant, 176 F.3d 565, 573-74, 574 n.15 (1st Cir. 1999) (holding that "[t]he fortuitous timing of the warrant application -- which appears like a last minute attempt to

943 F.3d 532, 542 (1st Cir. 2019) ("Probable cause does not require proof of guilt beyond a reasonable doubt, but 'only an objectively reasonable basis for believing that evidence of [the crime] can likely be found at the described locus at the time of the search.'" (alteration in original) (internal quotation marks omitted) (quoting United States v. Flores, 888 F.3d 537, 548 (1st Cir. 2018))), abrogated on other grounds by Thompson v. Clark, 596 U.S. 36 (2022). As the district court observed, a reviewing court "generally must defer to [the magistrate judge's] evaluations. [United States v. Ribeiro, 397 F.3d 43, 48 (1st Cir. 2005).] Cortez has provided no basis to depart from that general rule and set aside the Magistrate Judge's assessment here."[2] We agree.

### 3. Nexus to Attleboro Apartment

Cortez next argues that the June affidavit did not provide a sufficient factual basis for its assertion that there

---

implicate [the defendant] before [an] indictment [of another individual] was unsealed -- and the affidavit's juxtaposition of the scanty information about [the defendant] with the voluminous information about the already-indicted [individual] both . . . raise questions about the officer's objective good faith." (emphasis added)).

[2] Cortez implies that the district court erred in deferring to the Magistrate Judge. Such deference, however, was appropriate. See Zayas-Diaz, 95 F.3d at 111 ("Reviewing courts, including both the district court and the court of appeals, must accord 'considerable deference' to the 'probable cause' determination made by the issuing magistrate."); cf. United Roman, 942 F.3d at 53 (holding that the court "afford[s] no deference to the magistrate judge's determination" because "the affidavit . . . contained 'reckless misstatements'" (quoting Burke v. Town of Walpole, 405 F.3d 66, 82 (1st Cir. 2005)).

was probable cause to believe that Cortez resided in the Attleboro apartment and that Depina allowed Cortez to stay there.[3]

We disagree. We owe deference to the determination of the Magistrate Judge who issued the warrant, and conclude that the June affidavit adequately supported the conclusion that Cortez did reside in the Attleboro apartment. The June affidavit included, in direct support of Ball's assertion that Cortez resided there, GPS data and photographic evidence gathered from Cortez's cell phones, investigators' direct observations of Cortez and his vehicle at the location, and a link between Cortez and the owner of the apartment, who did not live there.[4] The June affidavit further provided Detective Ball's view, based on his training and experience, that gang members maintain gang-related materials, including photos and weapons, at their residences, and Cortez does not take issue with this portion of the affidavit.

---

[3] Cortez does not argue that if there was probable cause to believe that he resided in the Attleboro apartment, the district court erred in finding probable cause to believe that evidence of the offense would be found there. See Brox v. Hole, 83 F.4th 87, 97 n.2 (1st Cir. 2023) ("[A]rguments not made in an opening brief on appeal are deemed waived.").

[4] Cortez incorrectly argues the June affidavit asserted that law enforcement observed Cortez at the Attleboro apartment only once during the two weeks prior to submission of the warrant application, and his vehicle only once during the week leading up to the search. This mischaracterizes the record. Rather, the affidavit stated that "Cortez was observed at [the apartment] within the last two weeks," and that his vehicle was "most recent[ly] observ[ed] . . . within the last week."

- 17 -

Cortez is incorrect in his argument that the affidavit fell short because it did not specify the precise dates, times of day, or lengths of time during which Cortez was located at the apartment. Such a degree of specificity is not required.[5] See United States v. Barbosa, 896 F.3d 60, 68 (1st Cir. 2018) ("[T]here is no requirement that every shred of known information be included in a warrant affidavit . . . ."); United States v. Clark, 685 F.3d 72, 78 (1st Cir. 2012) ("In the search-warrant context, it is not necessary for an affiant, in describing supporting evidence, to be precise to the point of pedantry.").

The June affidavit moreover adequately supported Detective Ball's contention that the owner of the apartment, Depina, "allow[ed] Cortez to stay" at the Attleboro apartment, which in turn supported that Cortez lived there even though he did not own the apartment. Detective Ball cited evidence that while Depina owned the Attleboro apartment, he was not residing there, and further noted that Depina, "an NOB member/associate, [was] one of Cortez's close associates."

The information contained in the May affidavit that Cortez was then believed to be living elsewhere does not undermine the June affidavit's assertion of probable cause that Cortez was

---

[5] We reject for the same reason Cortez's argument that, in failing to explain how Cortez was identified in the video footage, the June affidavit "omitted material information."

by then residing at the Attleboro apartment.  Although the May affidavit characterized the location in Randolph as Cortez's home, Detective Ball in the June affidavit explained that investigators had gathered more evidence after the May search warrant had been executed which indicated that Cortez in fact resided at the Attleboro apartment.  Cf. United States v. Lucca, 377 F.3d 927, 931 (8th Cir. 2004) ("[A]n ongoing investigation may require changes to an initial warrant affidavit or the issuance of more than one search warrant.").

Nor did the district court, as Cortez maintains, erroneously rely on information contained in the May affidavit to support the court's approval of the June warrant application.  The court, in its analysis of the June warrant application, referred to information contained in the May affidavit, but correctly noted that the June affidavit also contained this information.

### 4. Challenge to Denial of Franks Hearing

The district court did not err in holding that Cortez was not entitled to a Franks hearing on his motion.  There was no clear error in its determination that Cortez had not made the necessary showing of any falsity.

"Under the Supreme Court's decision in Franks v. Delaware, 438 U.S. 154 (1978), a defendant may obtain an evidentiary hearing 'to challenge the truthfulness of statements made by law enforcement agents in a search warrant

- 19 -

affidavit' . . . ." United States v. Pérez-Greaux, 83 F.4th 1, 32 (1st Cir. 2023). A defendant is entitled to a Franks hearing only if they make "a substantial preliminary showing . . . that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth and that the false statement or omission was necessary to the finding of probable cause." Veloz, 948 F.3d at 427 (internal quotation marks omitted) (quoting United States v. Arias, 848 F.3d 504, 511 (1st Cir. 2017)). Because "[t]here is . . . a presumption of validity with respect to the affidavit supporting the search warrant," United States v. Rumney, 867 F.2d 714, 720 (1st Cir. 1989) (quoting Franks, 438 U.S. at 171-72), such a showing must consist of more than a mere conclusory statement that the affidavit is false, see Pérez-Greaux, 83 F.4th at 33. Rather, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." Id. (quoting United States v. Southard, 700 F.2d 1, 8 (1st Cir. 1983)). "[A] flat denial alone" is not sufficient to "'demonstrate a substantial possibility of affiant perjury.'" Id. (quoting Southard, 700 F.2d at 10).

Cortez contends that he was entitled to a Franks hearing based on two statements made in his counsel's affidavit. Cortez first points to his counsel's statement that he was "unable to identify the person setting fire to the vehicle" from the video

footage produced in discovery.  This argument misses the point, as the government asserted that its identification of Cortez was based on the clothing worn by the person in the video, and counsel did not contest this representation.[6]  Beyond that, this statement by Cortez's counsel was not accompanied by any offer of proof that law enforcement's identification of Cortez was false, nor that it was intentionally or recklessly so.[7]

The second statement pointed to by Cortez -- that his counsel could not locate text messages between Moses Cabral, named in the superseding indictment, and Cortez sent on April 28, 2020, which referred to the sale of fentanyl -- fares no better.  Cortez did not ever make an offer of proof in support of this statement.  Nor did the statement allege a "deliberate falsehood or . . . reckless disregard for the truth."  Pérez-Greaux, 83 F.4th at 33 (quoting Southard, 700 F.2d at 8); see also Southard,

_____

[6]  The record does not support Cortez's argument that the district court relied on this "extraneous information" as part of its probable cause determination.

[7]  We reject Cortez's argument that the district court should not have considered as part of its Franks analysis the government's explanation that the video footage identification was based on clothing.  This explanation was proffered by Cortez's counsel without contest.  Even in the absence of this explanation, Cortez has failed to make the necessary substantial preliminary showing for a Franks hearing.  See United States v. Graf, 784 F.3d 1, 8 (1st Cir. 2015) (reviewing whether defendant's "motion for a Franks hearing and his accompanying evidence were facially sufficient to make a substantial preliminary showing" without considering "any additional evidence or justification from the government").

- 21 -

700 F.2d at 10 (holding that the defendants' "alleg[ations] that the affidavit contained an intentionally false statement" were "conclusory and unsupported by any offer of proof," and so "d[id] not demonstrate a substantial possibility of affiant perjury").

Moreover, Cortez did not argue before the district court that, in the absence of either the video footage or the text messages between himself and Cabral, "the affidavit's remaining content [would be] insufficient to establish probable cause."[8] United States v. Patterson, 877 F.3d 419, 424 (1st Cir. 2017) (quoting Franks, 438 U.S. at 156) (holding that, to be entitled to a Franks hearing, the "defendant must . . . make a substantial showing that the 'allegedly false statement is necessary to the finding of probable cause'" (quoting Franks, 438 U.S. at 156)).

## IV.

We **affirm** the district court's decision denying Cortez's motion to suppress evidence and request a Franks hearing. Accordingly, we reject Cortez's challenge to his conviction.

---

[8] Cortez argued in his brief that the good-faith exception to the exclusionary rule does not apply here. Because we affirm on other grounds, we do not address this argument.